**AMBASSADOR FINANCIAL SERVICES, INC., Appellant–Plaintiff,**

v.

**The INDIANA NATIONAL BANK and First Union National Bank, Appellees–Defendants.**

No. 41A04–9111–CV–357.

Court of Appeals of Indiana, Fourth District.

May 28, 1992.

Catherine C. Kennedy, Indianapolis, for appellant-plaintiff.

R.C. Richmond, III, Sommer & Barnard, Indianapolis, for appellees-defendants.

CONOVER, Judge.

Plaintiff–Appellant Ambassador Financial Services, Inc. (Ambassador) appeals from the grant of summary judgment in favor of Defendants–Appellees Indiana National Bank (INB) and First Union National Bank (First Union) (collectively referred to as Banks), from a complaint alleging wrongful payment and charging of its account on three checks bearing forged endorsements.

The sole restated issue for review is:

whether the trial court properly determined Ambassador, as a drawer, was precluded by the intended payee defense[1] from recovering against the

---

1. The Uniform Commercial Code (UCC) declares unauthorized signatures on negotiable instruments wholly inoperative. J. Bailey, *Brady on Bank Checks*, Forged Indorsements, ¶ 26.1.

However, banks in other states have successfully defended claims for payment of checks bearing forged endorsements by using the "intended payee defense." That defense applies in such states in spite of the forged endorsements

Banks for paying over forged endorsements.

Affirmed.

Ambassador, a financial services company, agreed to finance the purchase of seven "gray market"[2] Mercedes Benz automobiles. The purchase deal, spear-headed by Harry Walsh (Walsh), an operator and an agent of Beltax, a now defunct "trading" corporation, involved seven different buyers, or one investor for each car. The investors intended to lease the cars to Beltax once the sales were completed so the company could start a limousine service.

Ambassador then proceeded to do a credit and financial check on each buyer, and presented the information to INB. After INB approved the buyer's credit, it agreed to purchase the financing paper from Ambassador. INB supplied Ambassador with financing contracts for the deal.

Each purchaser executed a promissory note. Ambassador then issued checks made jointly payable to Walsh, and each buyer/investor to pay for the cars.[3] Ambassador sent the checks to Walsh, made jointly payable to him and three individual investors, namely, Robert L. Cunningham, Frank Mutz, and Donald Dewhurst. Each check, drawn on Ambassador's account at INB was in the amount of $16,000. Walsh endorsed his name, and each of the three co-payees' names. Walsh presented and deposited each check into an account in his name "d/b/a Beltax" at First Union, the depository bank. (R. 203–206). Having failed to notice the forgeries, First Union passed the checks to INB, the payor or drawee bank for final payment. INB then charged Ambassador's account for the amount of the three checks.

Upon discovering the forgeries, Ambassador learned that neither the purchasers nor INB, as lien holder, had received the cars or the cars' titles. Ambassador notified INB of the forgeries and requested its account be credited.

INB made a similar demand upon First Union which had received the forged checks as the depository bank from Walsh. When First Union refused to re-credit INB, INB refused to re-credit Ambassador's account.

Ambassador admits it intended Walsh, as the seller of the cars, was to receive the checks' proceeds. Each of the three purchasers, however, denied Ambassador advised them how payment for the cars was going to be made, or that Ambassador was sending the checks to Walsh.

Ambassador then filed suit to have its account re-credited on breach of contract theories. After Ambassador and the Banks filed summary judgment motions the trial court found:

---

if such checks' proceeds actually reach the person the checks' drawers intend should receive them. *See* 10 Am.Jur.2d *Banks* § 625, at 592–93; *Atlantic Bank of New York v. Israel Discount Bank Ltd.,* 108 Misc.2d 342, 441 N.Y.S.2d 315, 317–318 (1981); *See County Bank, Greenwood v. South Carolina Nat. Bank, Greenville,* 244 S.C. 327, 137 S.E.2d 281 (1964); *Conwed Corp. v. First–Citizens Bank & Trust Co.,* 262 S.C. 48, 202 S.E.2d 22 (1974); *Starkey Const., Inc. v. Elcon, Inc.,* 248 Ark. 958, 457 S.W.2d 509 (1970); *Gordon v. State St. Bank & Trust Co.* (1972), 361 Mass. 258, 280 N.E.2d 152; *Coplin v. Maryland Trust Co.,* 222 Md. 119, 159 A.2d 356, 358 (1960); *Tonelli v. Chase Manhattan Bank, N.A.,* 41 N.Y.2d 667, 394 N.Y.S.2d 858, 363 N.E.2d 564 (1977); *see also, Glenn Falls Indemnity Co. v. Palmetto Bank,* 23 F.Supp. 844 (W.D.S.C.1938). Here, the Banks successfully argued that defense below. They claimed the intended payee defense here precluded the drawer, Ambassador, from recovering because Ambassador intended these checks' proceeds go to Walsh, one of the two joint payees on each check, and the forger in each case.

Usually, banks can escape liability for such a technical violation when the real cause of the drawer's loss was not the paying of the check, but rather, what was done with the proceeds after they were paid, something for which the drawee bank should not be held responsible. *See Coplin v. Maryland Trust Co.,* 222 Md. 119, 159 A.2d 356, 360.

**2.** The term "gray market" is defined as a market using irregular channels of trade or undercover methods not actually or explicitly illegal and chiefly in scarce material at excessive prices. *Webster's Third New International Dictionary* 933 (1976).

**3.** Ambassador claims it made out the checks to Walsh and the purchasers so the buyers "could follow the proper progress of the sales, and eventually sign off on the checks and obtain delivery of the cars." (R. 114).

1) The alleged forger/payee not only was the individual for whom the money was intended, but the plaintiff herein sent the checks to this individual while he still had the vehicles.

2) All persuasive authority, even examining the facts most favorable for the Plaintiff, direct as a matter of law that the Defendant's [sic] are entitled to Judgment.

3) There exists no Indiana authority on this point, yet.

THEREFORE, plaintiff's Motion for Summary Judgment is DENIED; Defendant's [sic] Motions for Summary Judgment are GRANTED. This ORDER is a final, appealable ORDER.

(R. 311).

▮ In reviewing the grant of a motion for summary judgment, our standard of review is well-settled. We consider the contents of the pleadings, affidavits, answers to interrogatories, responses to requests for admission, and depositions in a light most favorable to the non-moving party to determine whether any genuine issue of material fact exists, and whether the moving party is entitled to judgment as a matter of law. When a motion for summary judgment is granted, the non-moving party is denied his day in court; therefore, the trial court's decision must be carefully scrutinized on appeal. In reviewing the granting of a motion for summary judgment, this court stands in the shoes of the trial court and applies the same standard. *Progressive Constr. v. Ind. & Mich. Elec.* (1989), Ind.App., 533 N.E.2d 1279, 1282.

Ambassador first contends the banks are strictly liable for paying the forged checks, relying upon *Clark v. Griffin* (1985), Ind. App., 481 N.E.2d 170, 173, and *Payroll Check Cashing v. New Palestine Bank* (1980), Ind.App., 401 N.E.2d 752, 754.[4] Ambassador urges the UCC mandates a drawee bank may only charge its customers for items "properly payable." IND. CODE 26-1-4-401. It claims the Banks

cannot use the intended payee defense because that defense only applies where the non-endorsing payee has no interest in the transaction. Ambassador further claims because the car buyers were interested in both the transaction and the checks' proceeds, the defense the Banks rely upon does not apply.

Conversely, the Banks argue because the proceeds of the checks actually reached Walsh, the person Ambassador intended to receive them, the trial court did not err by granting summary judgment.

Although this issue is one of first impression in Indiana, many jurisdictions have recognized the intended payee defense, although not always from the same statutory source.

Several courts have held it is derived from an interpretation of § 3–405 of the UCC, commonly known as the "fictitious payee" rule. *See e.g., Gordon v. State St. Bank & Trust Co.* (1972), 361 Mass. 258, 280 N.E.2d 152. Other courts hold the defense arises from UCC § 3–404. *See e.g., Gotham–Vladimir Advertising, Inc. v. First Nat. City Bank* (1976), 27 A.D.2d 190, 277 N.Y.S.2d 719 (applying Negotiable Instrument Law § 23, the predecessor to UCC § 3–404). Other courts say the intended payee defense is an equitable rule, not involving any particular UCC section, and applies in transactions where the payee whose name was forged was never intended to have an interest in the transaction. In such case they argue, no party suffers damage even though the bank paid over a forged endorsement. *See e.g., Bankers Trust of South Carolina v. South Carolina Nat. Bank of Charleston* (1985), 284 S.C. 238, 325 S.E.2d 81.

In some courts, the defense, also referred to as "constructive receipt," has been defined as a narrow defense grounded in equity. *First City Nat. Bank v. Federal Deposit Ins. Corp.* (1986), 5th Cir., 782

---

**4.** However, these cases do not apply here. In *Payroll Check Cashing,* although the court held a drawee who pays an instrument bearing a forged endorsement is bound on his acceptance and cannot recover back his payment, the intended payee defense was not relied upon or utilized. *See Payroll Check Cashing, supra,* at 755. Also, in *Clark,* the intended payee defense was not at issue. *See Clark, supra,* at 173.

F.2d 1344, 1348. In those instances, it has been applied to prevent a drawer from recovering when he has suffered no loss. *Id.* The court in *First City Nat. Bank* declined to apply the constructive receipt defense, finding it:

> ... not only requires that the rightful payee receive the proceeds of the converted check, but also, and this is critical, that the proceeds of the check be applied to the purpose intended by the drawer.

*Id.*

Ambassador takes the position in its brief, "the defense does not apply when the payee whose signature was forged or is missing, was an integral party of the transaction and when the payee and/or drawer of the check suffered damages as a result of the forgery." Brief of Appellant at 11. Because the investors, and INB, the lien holder, never received titles to the cars, Ambassador argues it was damaged.

Ambassador finally contends the defense does not apply here because the three requirements necessary for a bank to successfully defend against liability are missing: (1) a showing that the actual proceeds of the check reach the intended payee, (2) that the proceeds were applied by the payee for the purposes intended by the drawer, and (3) that no special damages resulted. *Trans–American Steel Corp. v. Federal Ins. Co.* (1982), 535 F.Supp. 1185, 1190.[5] We disagree.

◼ We find the trial court did not err when it found the Banks could escape liability by using the intended payee defense. A drawer cannot demand replenishment of his account if the proceeds of the check reached the person he intended; therefore, he cannot show any loss by the drawee's wrongful payment. Whaley, *Forged Endorsements and the UCC's "Holder"*, 6 Ind.L.Rev. 52, n. 24 (1974). An action by the drawer of a check against his bank may be defended by proof that payment was made to the person entitled to it as against the drawer. *Hillsley v. State Bank of Albany* (1965), 24 A.D.2d 28, 263 N.Y.S.2d 578, 581. Further, in a claim by a drawer, a bank can escape liability when the real cause of the drawer's loss was not a bank paying over a forged endorsement, but was what was done with the proceeds after they were paid. *Coplin v. Maryland Trust Co.* (1960), 222 Md. 119, 159 A.2d 356, 260.

◼ Here, the proceeds of the checks did in fact reach the intended payee. Ambassador suffered no loss by reason of the checks' payment because Walsh received the proceeds as Ambassador intended. Its loss was not caused by the Banks' technical failure of paying over the forged endorsements, but by Walsh's apparent failure to purchase the cars, something over which the drawee bank had no control. *See Commercial Credit Corp. v. Empire Trust Co.* (1958), 8th Cir., 260 F.2d 132. Ambassador sent the checks to Walsh and intended Walsh to receive the proceeds on behalf of Beltax, as well as the investors/purchasers. (R. 113–114). Further, even though Walsh forged his co-payees' signatures, he deposited the proceeds into an account bearing his name doing business as Beltax, the trading company who would benefit most from the deal's outcome. (R. 203–206).

Affirmed.

RATLIFF, C.J., and CHEZEM, J., concur.

---

**5.** Ambassador mistakenly relies upon *Trans–American Steel Corp.* to support its argument to invoke the intended payee defense a bank must meet three requirements. In *Trans–American Steel Corp.*, the defendant bank did not attempt, or even claim to be able to trace a check's proceeds to an intended payee. The bank did not rely upon the intended payee defense. Rather, the court adopted the rule that liability of a depository or drawee bank will be reduced by any amounts which the forger has paid in restitution to the drawer or payee. *Trans–American Steel Corp., supra*, at 1190. The court used the intended payee defense as a corollary example. *Id.*