**AMBASSADOR FINANCIAL
SERVICES, INC.,** Appellant
(Plaintiff Below),

v.

**The INDIANA NATIONAL BANK**
and First Union National Bank,
Appellees (Defendants Below).

No. 41S04–9212–CV–1026.

Supreme Court of Indiana.

Dec. 23, 1992.

Rehearing Denied March 24, 1993.

Catherine C. Kennedy, Indianapolis, for appellant.

R.C. Richmond, III, Indianapolis, for appellees.

SHEPARD, Chief Justice.

This case presents an issue of first impression for this Court: whether the "intended payee" defense is available under Indiana law to relieve a bank from its liability for paying a check over the forged endorsement of a payee. We hold that it is available.

### Procedural History

Ambassador Financial Services, Inc. ("Ambassador") filed suit against The Indiana National Bank ("INB") and First Union National Bank (f/k/a First Georgia

Bank) ("First Union") over the acceptance and payment of three checks written on Ambassador's INB account. Ambassador alleged that First Union wrongfully paid and INB wrongfully charged Ambassador's account on the checks because the endorsement of one of the two co-payees on each check was forged. Ambassador sought a refund of the total amount of the three checks, statutory damages, attorney's fees, and costs. First Union and INB raised several affirmative defenses in their answers, including claims that Ambassador's own negligence in regard to the checks substantially contributed to the alleged forgeries.

Ambassador moved for summary judgment on its claims, and the banks responded with a joint motion for summary judgment. The banks argued that Ambassador was not entitled to recover because the proceeds from the checks actually reached the person whom Ambassador intended to receive them.

The trial court denied Ambassador's motion for summary judgment and granted the banks' motion. In granting the motion, the court made the following findings:

1) The alleged forger/payee not only was the individual for whom the money was intended, but the Plaintiff herein sent the checks to this individual while he still had the vehicles.

2) All persuasive authority, even examining the facts most favorable for the Plaintiff, direct as a matter of law that the Defendant's [sic] are entitled to Judgment.

3) There exists no Indiana Authority on this point, yet.

(Record at 321).

Ambassador appealed the trial court's grant of summary judgment to the Indiana Court of Appeals. It argued that even if the intended payee defense is recognized under Indiana law, the defense does not apply under the facts of this case. According to Ambassador, the defense does not apply when the co-payee whose signature was forged or missing was an integral part of the transaction and suffered damages as a result of the forgery.

The Court of Appeals rejected Ambassador's argument and affirmed the trial court. *Ambassador Fin. Servs. v. Indiana Nat'l Bank* (1992), Ind.App., 591 N.E.2d 1061.

The issue presented to this Court on Ambassador's petition to transfer is whether the intended payee defense is available to INB and First Union to relieve them from liability for payment of Ambassador's checks over the forged endorsement of a co-payee.[1] We grant transfer.

*Facts*

Ambassador first became involved in the transaction giving rise to this case in September 1986, when Harry Walsh contacted it about financing the purchase of several Mercedes Benz automobiles for prospective investors whom Walsh had found. Walsh represented himself as the half owner of Beltax Corporation ("Beltax"), a company located in Atlanta, Georgia. Robert Cunningham, Frank Mutz, and Donald Dewhurst ("the investors") were to purchase certain automobiles which would be imported from abroad and later leased to Beltax for its limousine business. Each purchase was to be secured by a note on which Beltax would make payment. The investors would own the automobiles but would not pay insurance or make any payments on them. The lease arrangement would yield the investors tax credits and a percentage of the profits realized from the lease.

Ambassador apparently was never completely informed of the details of the sales transaction. From the initial negotiations, Ambassador did understand that Beltax would be making the payments on the car notes for the investors.

As it took steps to establish the financing, Ambassador received information about the automobiles, the manner of im-

---

1. The banks have alleged that Ambassador was negligent with respect to issuing the checks, but that issue is not part of this appeal.

portation, the investors, and insurance verification for the automobiles. It also received credit applications for each prospective automobile purchaser. Walsh provided Ambassador with tax returns, financial statements, and other information about the investors.

Ambassador then provided INB with the information regarding the investors, so that it might determine their creditworthiness. INB apparently was satisfied with the transactions. INB provided Ambassador with the documents to use in the financing/sales transactions. The agreement between each investor and Ambassador took the form of a retail sales contract. Each investor executed a retail sales contract, security agreement, and truth-in-lending disclosure for the purchase of the automobile.

The record demonstrates that the parties had substantially different understandings about what Ambassador's precise legal position would be in the transaction. The investors understood Ambassador to be the seller of the automobiles. In the retail sales contracts, Ambassador was designated as the "dealer" of the automobiles. On the other hand, Ambassador understood that Walsh was the seller and that it was merely a lender. Each investor executed a note payable to INB for the automobile, and signed the retail sales contract with Ambassador. INB was further involved by virtue of its lending and checking relationship with Ambassador and its role as assignee of Ambassador's retail finance contracts.

This case arose from the circumstances surrounding Ambassador's advance of funds for the automobile purchases. In financing the investors' purchases, Ambassador was required to provide Walsh with $16,000 per car. Walsh told Ambassador that he had to pay for the cars before they were imported. He also assured Ambassador that the investors were aware of the timing of payment, and that they had authorized Ambassador to send payment for the automobiles directly to Walsh. Payment for the automobiles consisted of three checks written on Ambassador's INB account payable jointly to the investor and Walsh. Ambassador claims that it obtained the investors' permission to send the checks to Walsh. That fact is in dispute, however, as the investors claim they never granted Ambassador permission to send the checks to Walsh.

Ambassador intended that Walsh receive the funds from the checks so that he could pay the importer. Ambassador does not claim, and the record does not suggest, that the investors ever were to handle the proceeds from the checks. Ambassador made the checks co-payable to the investors so they could protect their interests in the transaction. Jointly payable checks would allow the investors to "follow the proper progress of the vehicles that they were purchasing, and eventually sign off on the checks and obtain delivery of their vehicles." (Record at 146). Ambassador assumed that each investor would not endorse his check until he was in a safe position in regards to the automobile.

Ambassador sent the three jointly payable checks to Walsh. The checks were written for $16,000 each, to the order of Mutz and Walsh, Cunningham and Walsh, and Dewhurst and Walsh. Ambassador claims that its representative called each of the investors individually to inform them that he was mailing the jointly payable checks to Walsh. According to Ambassador, "We asked them to sign off their check only when they received their cars. They assured [us] that they would only sign off on the checks as their vehicle was ready for delivery." (Record at 146). However, the investors claim that Ambassador never instructed them as to the checks, and that Walsh did not notify them when he received their checks.

None of the co-payees received, endorsed, or negotiated their respective checks. Walsh received the three checks. Without authorization, permission, or knowledge, Walsh apparently forged the co-payee's endorsements and deposited the checks into his account at First Union. The checks to Walsh and Cunningham and Walsh and Mutz were deposited in late September 1986. The check to Walsh and

Dewhurst was deposited in December 1986. INB received the checks from the Federal Reserve Bank of Chicago in late September and early December 1986, and it debited Ambassador's account for them.

Each co-payee has identified the endorsement of his check as a forgery. Ambassador discovered the forgeries and notified INB of them. Ambassador demanded that INB credit its account in the amount of the three checks, but INB refused. INB has continued to refuse to reimburse the charges.

The sales transaction was never completed as planned. None of the investors received the certificates of title, bills of sale, or transfer documents for the automobiles. Walsh never delivered the automobiles as the deal required. Moreover, it appears that Beltax's business has dissolved.

INB purchased the investors' contracts from Ambassador after the transaction was funded. Ambassador warranted in its assignment to INB that it had the automobile titles in its possession. Because Ambassador never received the titles, it was in default to INB under their agreement. As a result, Ambassador deemed it necessary to pay off the loans with INB in June 1987.

*Discussion*

Ambassador argues that the banks are strictly liable for payment of the three checks over the forged endorsement of the co-payees and that no defense is available to relieve appellees of this liability. Ambassador argues that the intended payee defense is unavailable to the banks because the defense applies only to those forged endorsement cases in which the non-endorsing payee has no interest in either the check or the transaction at issue. Ambassador further contends that the defense is available only when the following conditions are satisfied: (1) the intended payee actually received the proceeds of the check; (2) the proceeds were applied for the purpose intended by the drawer; and (3) the drawer has suffered no damages.

The banks argue that the Court of Appeals correctly affirmed the trial court's order granting them summary judgment.

They argue that both courts were correct in concluding that Ambassador was precluded from recovering against the banks because the proceeds of the checks actually reached Walsh, the person whom Ambassador (the drawer) intended to receive them. Appellees argue that Ambassador misstates the elements of the intended payee defense. To establish the defense, they say, a drawer need only establish that the proceeds of the checks reached the intended payee. In their view, the banks need not show that the proceeds were applied for the intended purpose or that the drawer has suffered no damages in the transaction. The banks argue that their payment over forged endorsements should not make them responsible for the damage caused by Walsh's failure to deliver the automobiles. The real cause of Ambassador's loss was not caused by the paying of the check, but rather what was done with the proceeds after the check was paid, a circumstance over which the banks had no control.

The Court of Appeals essentially adopted appellees' argument on the intended payee defense. It concluded that in this case, the proceeds from the checks actually reached the intended payee, and that Ambassador suffered no loss by reason of the checks' payment. The court reasoned that Ambassador's "loss was not caused by the Banks' technical failure of paying over the forged endorsements, but by Walsh's apparent failure to purchase the cars, something over which the drawee bank had no control." *Ambassador*, 591 N.E.2d at 1064. The court chose to join states which analyze the applicability of the defense in terms of causation: "banks can escape liability for ... a technical violation [of paying over a forged endorsement] when the real cause of the drawer's loss was not the paying of the check, but rather, what was done with the proceeds after they were paid, something for which the drawee bank should not be held responsible." *Id.* at 1062 n. 1.

Summary judgment is appropriate only if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Ind.Trial

Rule 56(C). The moving party has the burden to prove the nonexistence of a genuine issue of material fact, and if there is any doubt the motion should be resolved in favor of the party opposing the motion. *Oelling v. Rao* (1992), Ind., 593 N.E.2d 189, 190. If the movant sustains this burden, to survive the summary judgment motion, the opponent may not rest upon the mere allegations or denials in his pleadings, but must set forth specific facts showing that there is a genuine issue for trial. T.R. 56(E).

On appeal from summary judgment, the reviewing appellate court faces the same issues that were before the trial court, and analyzes them in the same way as a trial court does. *Oelling,* 593 N.E.2d at 190; *Department of Revenue v. Caylor–Nickel Clinic* (1992), Ind., 587 N.E.2d 1311, 1313. On appeal, the party which lost in the trial court must persuade the appellate court the trial court's decision was erroneous. *Id.* We will carefully scrutinize the trial court's grant of summary judgment to assure that the non-prevailing party is not improperly prevented from having his day in court. *Caylor–Nickel,* 587 N.E.2d at 1313.

In this case, the trial court's grant of summary judgment to the banks was erroneous. We reverse because genuine issues of material fact exist as to whether the banks have established the elements of the intended payee defense as a matter of law. In dispute are the material issues of whether the investors authorized Ambassador to send the checks directly to Walsh, and whether the investors actually were instructed to delay endorsing their checks until they received the automobiles.

■ The Court of Appeals was correct in its determination that the intended payee defense is available under Indiana law. *See Shank v. Peoples State Bank* (1937), 104 Ind.App. 443, 458–59, 7 N.E.2d 46, 52. The court's formulation of the elements of the defense is in error, however, because it fails to take into account the policies underlying the intended payee defense as well as the Uniform Commercial Code ("U.C.C.").

We take this occasion to explicate the elements of the intended payee defense.

## I. U.C.C. § 4–401's "Properly Payable" Standard

■ The fundamental principle on which Ambassador's claims are grounded is the U.C.C. rule that a drawee bank may debit a drawer's account for any items that are "properly payable." Ind.Code Ann. § 26–1–4–401(1) (West 1980). By negative implication, section 4–401 "denies the drawee bank the right to charge amounts not properly payable." 1 JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 15–3, at 751 (3d ed., Practitioner's Ed.1988) [hereinafter WHITE & SUMMERS]. Checks bearing a forged endorsement are not "properly payable," *cf.* Ind.Code Ann. § 26–1–3–404 (West Supp.1992), and a bank's payment of a check over an unauthorized signature of the payee "generally is at the bank's risk." Harry Pratter & R. Bruce Townsend, *Indiana Comment, in* Ind.Code Ann. § 26–1–4–401 (Burns 1974).

■ A drawee bank which pays a check over the forged endorsement of a payee is strictly liable to the drawer for the amount of the improper payment. *Payroll Check Cashing v. New Palestine Bank* (1980), Ind.App., 401 N.E.2d 752, 754. The drawer's remedy for improper payment is to obtain a recredit of his account from the drawee bank in the amount of the improper payment. *See generally* WHITE & SUMMERS, *supra,* § 15–3, at 751 n. 1 (citing *Stone & Webster Eng'g Corp. v. First Nat'l Bank & Trust,* 345 Mass. 1, 184 N.E.2d 358 (1962) for the proposition that the U.C.C. "properly payable" standard retains the common law rule that a drawer can insist that drawee recredit his account for improper payments).

■ In the context of a jointly payable check, the check is not "properly payable" unless both payees endorse the check. Section 3–116 of the Indiana Commercial Code provides: "An instrument payable to the order of two (2) or more persons ... (b) if not in the alternative is payable to all of them and may be negotiated, discharged or

enforced only by all of them." Ind.Code Ann. § 26-1-3-116 (West 1980). The Indiana Court of Appeals has recognized the significance of jointly payable checks in commercial transactions. *See Yeager & Sullivan, Inc. v. Farmers Bank* (1974), 162 Ind.App. 15, 26, 317 N.E.2d 792, 799. " '[T]he cardinal purpose for ... [a joint payee check] is to prevent either payee from transferring the instrument or [on [sic]] receiving money on it without the concurrence of the other....' " *Id.* (quoting *Harry H. White Lumber Co. v. Crocker-Citizens Nat'l Bank,* 61 Cal.Rptr. 381, 385 (Cal.Ct.App.1967)).

■ Ambassador's checks to Cunningham and Walsh, Mutz and Walsh, and Dewhurst and Walsh were not "properly payable" by INB. The fact that the investors' endorsements were forgeries is not in dispute. INB violated Indiana Commercial Code section 4-401 when it charged Ambassador's account for checks bearing forged endorsements. INB is therefore strictly liable to Ambassador in the amount of the improper charges. Unless INB establishes a defense relieving or reducing its strict liability, Ambassador is entitled to obtain from INB a recredit of its account in the amount of the improper payments.

## II. Background Of the Intended Payee Defense

■ Recognizing that not all improper payments cause a loss which should be actionable, the Indiana legislature and courts have established several statutory and equitable defenses for a bank which pays a check over the forged endorsement of a payee. Under Ind.Code Ann. § 26-1-3-404 (West Supp.1992), for example, an otherwise invalid endorsement may become operative as the named person's signature if that person ratifies the signature or is precluded by estoppel from denying it. *See also id.* (Indiana Comment) (West 1980). The "fictitious payee" defense, codified at Ind.Code Ann. § 26-1-3-405 (West 1980), similarly allows a drawee bank to escape from its liability for improperly paying a check bearing the forged endorsement of a payee. Under that defense, an endorse-ment by any person in the name of a named payee is deemed effective if an imposter has induced the drawer to issue the check to him in the name of the payee. *Id.*

Apart from the statutory defenses to liability expressly provided by the U.C.C., certain equitable defenses exist to reduce or eliminate a drawee bank's liability for payment of a check bearing the forged endorsement of a payee. *See generally* Ind. Code Ann. § 26-1-1-103 (West Supp.1992) ("Unless displaced by the particular provisions of [the Indiana Commercial Code], the principles of law and equity ... shall supplement the provisions of [the Commercial Code]."). Separate from, but closely associated with, the intended payee defense is the defense of mitigation of damages for a drawee or collecting bank defending a conversion action brought pursuant to Ind. Code Ann. § 26-1-3-419 (West Supp.1992) by a payee whose endorsement was forged or missing. The mitigation of damages defense reduces the bank's liability to the extent the proceeds of the check were received by the payee and applied to the specific debt to which the payee intended they apply. *Yeager & Sullivan,* 162 Ind. App. at 25, 317 N.E.2d at 798.

■ The mitigation of damages defense is aimed at preventing unjust enrichment, and it exists to prevent a payee from recovering on a forged endorsement to the extent the payee did not suffer damages in the transaction. A defendant seeking the benefit of the defense must show that the check proceeds were applied as the payee intended because otherwise the defense would have "the effect of allowing the tortfeasor to dictate to the true owner how his property is to be used." *Id.* at 26, 317 N.E.2d at 799.

The intended payee defense is similarly aimed at preventing a drawer from being unjustly enriched by recovering for an improperly paid check when the proceeds of the check in fact were received by the payee intended by the drawer and the drawer suffered no damages caused by the improper payment. The Appellate Court of Indiana applied this defense as long ago as 1937, *Shank v. Peoples State Bank,* 104

Ind.App. at 458–59, 7 N.E.2d at 52, and some say it has attained "universal recognition," *Commercial Credit Corp. v. Empire Trust Co.*, 260 F.2d 132, 134 (8th Cir.1958). The defense "is based on the view that the drawer should not be permitted to recover from the drawee bank where he has suffered no loss from the improper payment of a check." *Tonelli v. Chase Manhattan Bank*, 41 N.Y.2d 667, 394 N.Y.S.2d 858, 860–61, 363 N.E.2d 564, 567 (1977). The intended payee defense is based on the fundamental equitable principle that a defendant should obtain relief from liability when no damage has resulted from his wrongdoing. *See Shank*, 104 Ind. App. at 458, 7 N.E.2d at 52.

In addition to the policy against unjust enrichment, the intended payee defense is also grounded on the tort notion of causation. The intended payee defense is available to a bank which has paid a check over the forged endorsement of a payee when the bank's improper payment is not a cause of the drawer's injury flowing from the transaction. This causation aspect envisions occasions in which the drawer is damaged in a forged check transaction but the forgery in no way precipitated or caused the damage. *See, e.g., Modern Equip. Corp. v. Northern Trust Co.*, 284 Ill.App. 586, 1 N.E.2d 105 (1936).

In *Modern Equipment,* the endorsement of a payee on several one-party checks was forged by the payee's wife. *Id.* 1 N.E.2d at 106. Because the wife deposited the proceeds into the husband and wife's joint bank account, the court determined that the intended payee actually received the funds. *Id.* at 108. The court held that the drawer could not recover on the forged check because any damages the drawer suffered in respect to the check transactions had no relation to and were not caused by the forgeries. *Id.* No act of the drawer in relation to the checks contributed to the loss suffered by the drawer in its transaction with the payee. *Id.*

In the context of jointly payable checks, the intended payee defense also commonly applies when the co-payee whose endorsement was forged was never intended to have an interest in the proceeds of the check. *See, e.g., Commercial Credit,* 260 F.2d 132; *Gordon v. State St. Bank & Trust Co.,* 361 Mass. 258, 280 N.E.2d 152 (1972); *Union Finance Co. v. National Bank,* 463 S.W.2d 70 (Mo.Ct.App.1970). In *Gordon,* the drawer wrote a jointly payable check to a husband and wife as a loan from the drawer to the husband. 280 N.E.2d at 153. Although the husband received the funds as intended, the wife's signature was forged on the check and the accompanying note. *Id.* at 154. Shortly after the loan was funded, the husband died and the wife claimed she never authorized her husband to sign the note for her. *Id.*

The drawer-lender in *Gordon* arguably was damaged in the amount of the unpaid portion of his loan, but the court nevertheless held that the intended payee defense relieved the drawee bank from any liability on the forgery. The court reasoned that the forgery did not cause the drawer's harm: "The drawer is not harmed if the drawee bank's action with respect to a check carries out (or does not interfere with the accomplishment of) the drawer's purpose with respect to that check." *Id.* The defense imposed no injustice in relieving the drawee bank from liability because "there has been precisely the expected benefit, as a consequence of the initial negotiation of the check, to the person intended to take the whole interest." *Id.* Rather, any damage caused to the drawer was caused by the forged signature on the note. *Id.* at 154 n. 1; *see also Commercial Credit,* 260 F.2d at 134 (applying the defense under the same facts as *Gordon,* court held it "is inescapable that the forged endorsement was not the proximate cause of plaintiff's loss"); *Union Finance,* 463 S.W.2d at 72 (under the same facts, concluding any loss to drawer caused not by forged endorsement but by forged signature on promissory note).

III. Elements Of The Intended Payee Defense

Based on the persuasive reasoning of the Appellate Court of Indiana in *Shank* and of the numerous other courts

which have applied the defense, we conclude that a defendant establishes the intended payee defense if defendant proves the following two elements:

(1) The proceeds of the check reached the person intended by the drawer to receive them; AND

(2) The drawer has suffered no loss or adverse effect on its rights in the transaction that was proximately caused by the bank's improper payment.

We decline Ambassador's suggestion to incorporate into the defense the requirement that a defendant prove that the check proceeds were actually applied by the payee for the purpose intended. Although that factual issue might be relevant in the determination of whether the drawer suffered a loss in the transaction, we can envision circumstances in which the defense is not available notwithstanding proper application of the funds, and in which the defense is available notwithstanding the fact that the funds were not used for the purpose intended.

### (1) Funds reach intended payee

A defendant establishes element (1) by proving that the proceeds of the check found their way to the person the drawer intended to ultimately receive them. In the case of a jointly payable check in which the signature of a co-payee is forged and the proceeds reach the other payee, a defendant could establish this element by showing that the non-signing co-payee was never intended to receive any part of the proceeds and the person ultimately intended by the drawer to receive the funds was in fact the other co-payee.

■ Under the facts of this case, the Banks have established element (1). It is undisputed that Walsh, the receiving co-payee, was the only person intended to ultimately receive the funds from the checks. There is no allegation that the co-payee investors were ever intended to receive the proceeds.

### (2) Lack of proximate causation

The Banks also must establish element (2) to avail themselves of the intended payee defense. To establish this element, a defendant must prove that the drawer has suffered no loss or adverse effect on its rights in the transaction that was proximately caused by the bank's improper payment. A bank will escape liability for a drawer's damages that were not caused by the bank's improper payment. Lack of causation can be proved by a showing that the bank's improper payment of a check carried out (or did not interfere with the accomplishment of) the drawer's purpose with respect to that check. *Gordon,* 280 N.E.2d at 154.

In allowing the defense when the bank's improper payment did not proximately cause the drawer's loss, we are recognizing that in some circumstances a bank is completely powerless to control the flow of money from a check, and the bank's improper payment has no effect on the outcome of the transaction such that a proper payment would prevent the damages. An improper payment proximately causes damages from a transaction when the improper payment alters the course of the transaction in a way necessary for the occurrence of damages.

In a business transaction, a drawer may choose to write a check in light of the drawer's goals in the transaction. For example, a drawer might write a check jointly to two payees with the plan that the payee not intended to receive the funds would act as a monitor of the transaction, or as a third-party beneficiary. *Pacific Metals Co. v. Tracy–Collins Bank & Trust Co.,* 21 Utah 2d 400, 446 P.2d 303, 305 (1968). When the drawee bank's improper payment prevents the check transaction from achieving the drawer's specific goal in reference to the check, and such obstruction precipitates drawer's damages in the transaction, the improper payment proximately causes the drawer's harm. *Cf. Blomquist v. Zions First Nat'l Bank,* 18 Utah 2d 65, 415 P.2d 213, 215 (1966) ("A well-recognized [rule] is that the depositor has no basis for complaint if what is done with the check

carries out his purpose...."").[2]

For example, in *Atlantic Bank v. Israel Discount Bank*, 108 Misc.2d 342, 441 N.Y.S.2d 315 (1981), a drawer wrote a check as an automobile loan jointly to the order of the seller and the buyer-borrower. Underneath the seller's endorsement space on the back of the check the drawer-lender had placed a "seller's statement" containing a declaration that a portion of the check did not represent proceeds of the loan to the buyer, and a promise by the co-payee-seller to file a lien statement on behalf of the drawer-lender. *Id.* at 316. The seller in fact never saw or endorsed the check, as the buyer forged the seller's endorsement and deposited the check into his own account. *See id.* Although the sales transaction went as planned and the seller received payment for the automobile, the drawer-lender was damaged by the seller's failure to file the lien on behalf of the drawer-lender. *Id.* at 317.

Recognizing that the check proceeds reached the intended payee, the court nevertheless denied defendant the intended payee defense because the bank's improper payment proximately caused the drawer's damages in the transaction. *Id.* at 318. "[T]he destruction of [the drawer-lender's] potential lien was the direct and proximate result of the forged [seller] endorsement, and that damage flowing from the loss of the lien is compensable under [the U.C.C.]." *Id.* The court held the defendant liable even though a properly endorsed check would not have automatically ensured that drawer's lien would have been filed and the damage thus prevented. *Id.*

In our view, the facts of this case are precisely analogous to the facts of the check transaction in *Atlantic Bank*. In this case, the drawer wrote the check in a particular way in order to protect the interests of the purchaser-co-payee and to pre-vent the sort of damage that in fact occurred. Ambassador made the checks co-payable to the purchasers precisely so the purchasers would monitor the sales transaction and not endorse the check and release the funds until they received the automobiles. When the banks accepted and paid the checks without the purchasers' valid endorsements, the banks caused to occur just the sort of harm the drawer's check was designed to prevent.

Under the facts construed most favorably to the non-moving party, the banks have not demonstrated that they are entitled to judgment as a matter of law under the intended payee defense. We therefore reverse the trial court and remand for further preliminary proceedings or a trial on the merits.

DeBRULER, DICKSON and KRAHULIK, JJ., concur.

GIVAN, J., dissents without separate opinion.

---

2. Allowing the intended payee defense without requiring proof of a lack of proximate cause in some cases would lead to irrational results and provide defendant banks a windfall. *See, e.g., Florida Nat'l Bank v. Geer,* 96 So.2d 409 (Fla. 1957). In *Geer,* the court held that the intended payee defense applied even where the payment over a forged endorsement caused precisely the harm the drawer envisioned when he chose to write the check to a person other than the intended recipient of the funds. The drawer feared that the ultimate recipient would misappropriate the funds, so the drawer wrote the check to a third person to protect the drawer's interests.