James B. ISAAC and Cash Cattle Co., a
Partnership, Petitioners,

v.

AMERICAN HERITAGE BANK AND
TRUST CO., a Colorado corporation,
Respondent.

No. 81SC302.

Supreme Court of Colorado,
En Banc.

Jan. 9, 1984.

Howard J. Alpern, Isaac, Johnson & Alpern, Colorado Springs, for petitioners.

Otto K. Hilbert, Colorado Springs, for respondent.

DUBOFSKY, Justice.

We granted certiorari to review the judgment of the Court of Appeals in *American Heritage Bank and Trust Co. v. Isaac*, 636 P.2d 1296 (Colo.App.1981), which held that a bank customer may not recover for his bank's improper payment of a draft unless

the customer proves that the bank's action caused his loss. We affirm the judgment of the Court of Appeals.

James B. Isaac (Isaac), defendant-petitioner, and Mikle Sadler (Sadler) formed a partnership, Cash Cattle Co., to buy and sell cattle. On June 30, 1977, the partners executed a $102,000 note payable to American Heritage Bank and Trust Company (Bank), plaintiff-respondent. The proceeds of the note were credited to the partnership account in the Bank and were to be used to purchase cattle. The partners also signed an authorization which permitted the Bank "to accept and pay checks or drafts drawn upon any or all bank accounts ... *standing in the name* of said copartnership...." (Emphasis added.) The partnership name used in the authorization was "Cash Cattle Co.," and the authorization was to remain in effect unless amended in writing by both partners.

Sadler was the managing partner. He authorized all the transactions of the partnership in buying and selling cattle. Drafts drawn on the partnership and payable through the Bank were used to purchase the cattle. Whenever a draft was delivered to the Bank for payment, the Bank would telephone Sadler and receive his express approval before paying the draft. Isaac was the non-operating partner. He received the monthly bank statements, and the Bank relied on his financial statement when it made the loan to the partnership.

In January 1978, Sadler, his wife and another person had Articles of Incorporation filed with the Secretary of State of Texas for a corporation named "Cash Cattle Company." There is no evidence that this corporation ever functioned. Shortly after these Articles were filed, the Bank was presented over several days with four drafts drawn on "Cash Cattle Company, Inc." in the total amount of $85,430.30. In accordance with its usual practice, the Bank contacted Sadler, and he approved the payment of these drafts from the Cash Cattle Co. partnership account. It is unclear whether the Bank advised Sadler of the "Inc." reference or merely told him the amount of the drafts and to whom they were to be paid. In March, 1978, the partners executed another note to the Bank in the amount of $59,510.06.

On June 9, 1978, the Bank brought suit on the promissory notes, which were in default. Isaac claimed in defense that the Bank had caused him loss in the amount of the four drafts drawn on Cash Cattle Company, Inc., but paid from the Cash Cattle Co. partnership account. He asserted that the partnership records revealed that 180 cattle, worth approximately $90,000, were unaccounted for, and that the payment of the "Inc." drafts caused this loss. Isaac also made various cross-claims against Sadler for mismanagement and fraud. The Bank argued that the partnership suffered no loss from the payment of the "Inc." drafts because the cattle purchased with the "Inc." drafts were invoiced on the partnership records.

Sadler defaulted at trial. The district court entered judgment against Sadler and Isaac in the amount of $103,195.07, representing unpaid principal and interest on the notes, and $6,600 stipulated attorney fees. In addition, the court ruled that the Bank improperly charged against the partnership account the drafts drawn on Cash Cattle Company, Inc., because payment was made without the consent and authority of Isaac. Therefore, the court allowed Isaac a set-off of $85,430.30. In the district court's opinion, Sadler used the money for his own purposes. The court also held that Isaac did not prove his cross-claims against Sadler.

The Court of Appeals agreed that the Bank failed to exercise ordinary care in debiting the drafts drawn on Cash Cattle Company, Inc. However, the Court of Appeals reversed Isaac's set-off because there was insufficient evidence in the record to establish that the payment of the "Inc." drafts proximately caused Isaac's loss.

On certiorari review, Isaac argues that the Court of Appeals improperly substituted itself as a finder of fact; that the Bank is liable for improperly paying the "Inc."

drafts under both negligence and contract principles; that when a bank charges an item not properly payable against an account, the customer is entitled to have the account recredited without a showing of proximate cause; and that the Court of Appeals erred in affirming the district court's award of attorney fees. We disagree and hold that Isaac failed to carry his ultimate burden of proving that he suffered a loss as a result of the Bank's improper actions. Therefore, we affirm the judgment of the Court of Appeals.

## I.

The issue before us is how liability is established when a bank charges against a customer's account an item that is not properly payable.[1] The majority opinion of the Court of Appeals emphasizes common-law negligence principles. We think the better approach is through the Uniform Commercial Code (U.C.C.), codified in Colorado at sections 4–1–101, *et seq.*, C.R.S. and 1982 Supp. Article 4 of the Code governs bank deposits and collections and provides the framework for analysis.

■ The U.C.C. does not state specifically the customer's remedy for his bank's improper payment of a draft, but the customer's right to demand that the bank recredit his account may be implied from section 4–4–401(1), C.R.S., which provides:

As against its customer, a bank may charge against his account any item which is otherwise properly payable from that account. . . .

The negative implication that a bank may not charge against an account an item that is not properly payable is clear. In such a case the customer may demand that his account be recredited. *See G & R Corporation v. American Security & Trust Co.*, 523 F.2d 1164 (D.C.Cir.1975); *Ford Motor Credit Co. v. United States Automobile Ass'n*, 11 U.C.C. Rep.Serv. 361 (N.Y.Civ.Ct.

1972); *Cincinnati Insurance Company v. First National Bank of Akron*, 63 Ohio St.2d 220, 407 N.E.2d 519 (1980); J. White & R. Summers, *Uniform Commercial Code* 657, § 17–3 (1980). In most cases a customer demand is all that should be necessary. The question thus raised is whether a customer has an absolute right to recrediting, or whether the bank may assert defenses. The facts of this case demonstrate that a bank should not be required to automatically recredit its customer's account in all circumstances.

■ The district court and the Court of Appeals held that the Bank's improper payment of the "Inc." drafts was a failure to exercise due care. Section 4–4–103(5), C.R.S., establishes the amount a customer may recover when a bank improperly handles an item:

The measure of damages for failure to exercise ordinary care in handling an item is the amount of the item reduced by an amount which could not have been realized by the use of ordinary care. . . .

Comment 6 to section 4–4–103 provides additional guidance:

Of course, it continues to be necessary under subsection (5) as it has been under ordinary common law principles that, before the damage rule of the subsection becomes operative, liability of the bank and some loss to the customer or owner must be established.

This language indicates that the customer must establish that he suffered a loss resulting from the bank's action. We agree.

One of the basic principles of law is that a party may not recover damages if he has not suffered an injury. "To warrant the recovery of damages, there must be both a right of action for a wrong inflicted by the defendant and damage resulting to the plaintiff therefrom. Wrong without damage, or damage without wrong, does not constitute a cause of action." 22 *Am.*

---

**1.** Both the district court and the Court of Appeals ruled that the Bank did not exercise ordinary care when it charged the drafts drawn on Cash Cattle Company, Inc. against the partnership account of Cash Cattle Co. We think the

question of ordinary care is a close one, but because the Bank did not file a cross-petition for certiorari on this issue, we assume for purposes of this opinion that the draft was not properly payable.

*Jur.2d Damages* § 2 (1965). It is fundamental that the claimant must also establish that the loss was caused by the party being sued. "[B]efore damages can be awarded to a claimant he must establish that the damages he seeks are traceable to and are the direct result of the wrong sought to be redressed." *Runiks v. Peterson,* 155 Colo. 44, 45, 392 P.2d 590, 590 (1964).

We note, however, that the Supreme Court of Ohio, in *Cincinnati Insurance Co. v. First National Bank of Akron,* 63 Ohio St.2d 220, 407 N.E.2d 519 (1980), held that U.C.C. § 4–103(5)[2] does not apply to situations where a bank charges an item not properly payable. *Cincinnati Insurance* involved the payment of checks lacking necessary endorsements. The court said: "The trial court's ... reliance on [U.C.C. § 4–103(5) ] was misplaced. That section's specific reference to 'ordinary care' manifests an intent that it relate only to a negligence-type action and not one based on the duty imposed upon the bank under [U.C.C. § 4–401] to only pay 'properly payable' items of its customer." 407 N.E.2d at 523. It is unclear what the court meant by a "negligence-type action."[3] We believe that bank payment of an item not properly payable may be characterized as negligence because a contract may be breached by a failure to exercise ordinary care. *See Cosmopolitan Homes, Inc. v. Weller,* 663 P.2d 1041 (Colo.1983); *W. Prosser, The Law of Torts* § 92 at 616–18 (4th ed. 1971).

■ Relying on *Cincinnati Insurance,* Isaac asserts that by improperly paying an item a bank breaches its contract with its customer and, therefore, the bank must recredit the customer's account without regard to whether the customer has suffered a loss. While it is true that an improper payment is a breach of contract, the asserted remedy of recrediting an account is not required by contract principles. In order to recover more than nominal damages for breach of contract a plaintiff must prove that he suffered a loss resulting from the defendant's actions. *See J. Calamari & J. Perillo, Contracts* § 14–4 (2d ed. 1977).

In *Ford Motor Credit Co. v. United States Automobile Ass'n,* 11 U.C.C. Rep. Serv. 361 (N.Y.Civ.Ct.1972), a case cited approvingly by the Ohio Supreme Court in *Cincinnati Insurance,* the court held: "It is axiomatic in banking relations that a bank may pay a check and debit its customer's account only as directed by the customer. Failure to pay as directed renders the bank *strictly liable for any loss sustained." Id.* at 363 (citations omitted) (emphasis supplied). Strict liability in this context does not excuse the customer from establishing a causal loss; instead, the bank's liability may be established without proving fault of the bank. *See generally W. Prosser, Torts* § 75 (1971). We conclude that a bank customer must establish loss resulting from the bank's action before he is entitled to have his account recredited.

■ While a customer must show loss in the context of an action such as the one before us, this is not a substantial burden. The U.C.C. implicitly forbids a bank's charging of an item not properly payable against its customer's account. Normally, the customer need only demand that the bank recredit his account.[4] Similarly, a customer establishes his loss for purposes of a prima facie case merely by showing that the improper payment was charged to his account.

**2.** Section 4–4–103(5), C.R.S., is identical to U.C.C. § 4–103(5).

**3.** In *G & R Corp. v. American Security & Trust Co.,* 523 F.2d 1164, 1170–71 (D.C.Cir.1975), the United States Court of Appeals for the District of Columbia described the U.C.C. as incorporating traditional tort principles into common law contract actions.

**4.** In the case before us, Isaac made no complaint about improper payment and did not request recrediting of the partnership account until he filed his answer and counterclaims to the Bank's action on the unpaid notes on September 11, 1978.

If, however, the customer suffered no loss as a result of the bank's improper payment, he would be unjustly enriched by recovering the amount of the item from the bank. Therefore, the bank may come forward with evidence establishing that the customer did not suffer a loss. The bank has the burden of going forward at this point. Once a bank produces such evidence, the ultimate burden of proof of loss is on the customer. This is in keeping with the general principles discussed above that an injured party must prove his injury. Additionally, the customer is in the best position to establish his loss, and should bear the burden. This result is analogous to the U.C.C. requirement that a customer bear the burden of "establishing the fact and amount of loss resulting from the payment of an item contrary to a binding stop payment order." Section 4–4–403(3), C.R. S.1973. *Cf., Siegel v. New England Merchants Nat. Bank,* 386 Mass. 672, 437 N.E.2d 218 (1982).

The rule we adopt here is similar to the rule adopted by other courts in cases where a bank has paid an item over the valid stop payment order of its customer. In *Thomas v. Marine Midland Tinkers National Bank,* 86 Misc.2d 284, 381 N.Y.S.2d 797 (N.Y.Civ.Ct.1976), the court rejected defendant bank's argument that plaintiff had failed to prove the prima facie case since no evidence was introduced to negate the ultimate right of the payee to the proceeds of the stopped check. The court held: "[I]f the bank fails to meet its burden with legally sufficient proof of non loss, the customer has proven a prima facie case and is entitled to judgment. Where the burden of going forward is met by the bank, the customer must sustain the ultimate burden of proof on the issue of loss." *Id.* 381 N.Y.S.2d at 801–02. *Accord, Southeast First National Bank of Satellite Beach v. Atlantic Telec, Inc.,* 389 So.2d 1032 (Fla. App.1980); *Mitchell v. Republic Bank & Trust Company,* 35 N.C.App. 101, 239 S.E.2d 867 (1978).

In *Cooper v. Stock Yards Bank of Oklahoma City,* 644 P.2d 123 (Okl.App.1981), a bookkeeper, without proper authorization, signed checks on the company account to pay company creditors. The owner of the company, the customer of the bank, brought suit to recover the amount of all the checks signed by the bookkeeper. The Oklahoma court denied recovery, holding that the customer had failed to prove that he was damaged by the wrongful payment of the checks. "It is elementary that a party may not recover for a breach of duty unless he also proves he was damaged by the breach." *Id.* at 125. The court emphasized that the bank had offered uncontroverted evidence that all checks signed by the bookkeeper went to pay legitimate debts of the company.

We now turn to whether Isaac, as representative of Cash Cattle Co. partnership, carried the burden of proving that the partnership suffered a loss as a result of the Bank's improper payment. Because the partnership, not Isaac, was the Bank's customer, a loss to the partnership must be shown. Isaac established a prima facie case by showing that the Bank charged the "Inc." drafts against the partnership account. Additionally, Isaac presented evidence that Sadler filed Articles of Incorporation in Texas for a corporation named "Cash Cattle Company" shortly before the "Inc." drafts were presented to the bank. The partnership records indicate that the partnership purchased 180 more cattle, worth approximately $90,000, than it sold. Isaac argues that the discrepancy was caused by the payment of the "Inc." drafts in the amount of $85,430.30.

The record further indicates that the Bank met its burden of coming forward with evidence establishing that its actions did not cause a loss to the customer. The Bank pointed out that the four "Inc." drafts list the particular cattle that were purchased by the drafts. The drafts correspond exactly with invoices in the partnership records for purchases of cattle from the payee of the four drafts. These invoices were used by Sadler to approve the payment of drafts by the Bank. It is instructive to note that the four "Inc." drafts purchased 321 cattle, while Isaac claims the loss of 180 cattle. When questioned whether he knew what happened to the 180 cat-

tle, Isaac responded that he did not. Our review of the record establishes that the partnership did not carry its burden of proving that the Bank's improper payment resulted in a loss to the partnership.

The district court, however, found that Sadler used the money from the drafts for his own purposes, an implication that the partnership suffered a loss. The only evidence which might indicate that Sadler used these funds for his own purposes is that Sadler filed Articles of Incorporation in Texas shortly before the drafts were paid, and that the partnership cannot account for 180 cattle. The inference presumably is that Sadler used the funds from the "Inc." drafts to purchase 180 cattle for his corporation, a corporation that was never shown to have operated.

Although the factual findings of a trial court are not to be disturbed upon appeal unless clearly erroneous and not supported by the record, *Gebhardt v. Gebhardt*, 198 Colo. 28, 30, 595 P.2d 1048, 1050 (1979), the district court's inferential finding here is clearly erroneous in light of the uncontroverted documentary evidence that the Bank paid the "Inc." drafts to the payee of the drafts for 321 cattle, a purchase clearly invoiced on the records of the partnership. Whatever happened to the 180 cattle, Isaac did not prove that their loss was caused by the Bank's action of paying the "Inc." drafts.[5]

■ The Court of Appeals held that the evidence did not establish that the Bank's action was the proximate cause of the partnership's loss. We hold that in this context a customer need only show that the bank's

action was a cause of loss. Section 4–4–103(5), C.R.S.; *Marcoux v. Van Wyk*, 572 F.2d 651, 656 (8th Cir.1978); *Whalen & Sons Grain Company v. Missouri Delta Bank*, 496 F.Supp. 211, 215 (E.D.Mo.1980).

## II.

■ There is no merit in Isaac's contention that the Court of Appeals erred in awarding attorney fees. The record indicates that the Bank and Isaac stipulated to these fees. Isaac may not now argue that the award was improper. *People v. Dee*, 638 P.2d 749 (1981).

The judgment is affirmed.

KIRSHBAUM, J., does not participate.

---

**5.** In this case the Bank might also have avoided liability by relying on section 4–4–407, C.R.S. 1973, which provides in part:

"If a payor bank has paid an item ... under circumstances giving a basis for objection by the drawer or maker, to prevent unjust enrichment and only to the extent necessary to prevent loss to the bank by reason of its payment of the item, the bank shall be subrogated to the rights: ...

(b) Of the payee ... against the drawer or maker either on the item or under the transaction out of which the item arose...."

If the payee on the four disputed drafts actually sent cattle to the partnership under these drafts,

the Bank would be subrogated to its rights against the partnership. *See Siegel v. New England Merchants National Bank*, 386 Mass. 672, 437 N.E.2d 218 (1982); *Cincinnati Insurance Co. v. First National Bank of Akron*, 63 Ohio St.2d 220, 407 N.E.2d 519 (1980); *Desiree Mines, Ltd. v. Provident National Bank*, 7 Pa.D. & C.3d 163, 25 U.C.C.Rep.Serv. 1129 (1978).

The Bank's right to subrogation is not an exclusive remedy. Comment 5 to 4–4–407 provides in part: "The spelling out of the affirmative rights of the bank in this section does not destroy other existing rights (Section 1–103)."