SANWA BUSINESS CREDIT CORPORATION, Plaintiff-Appellant, v. CONTINENTAL ILLINOIS NATIONAL BANK AND TRUST COMPANY OF CHICAGO, Defendant-Appellee.

First District (2nd Division)   No. 1—91—4084

Opinion filed May 18, 1993.

Sachnoff & Weaver, Ltd., of Chicago (Arnold A. Pagniucci, of counsel), for appellant.

Arnstein & Lehr, of Chicago (Richard H. Ferri, of counsel), for appellee.

JUSTICE DiVITO delivered the opinion of the court:

Plaintiff Sanwa Business Credit Corporation (Sanwa) wrote five checks to multiple payees on its account with defendant Continental Illinois National Bank (Continental) in connection with four transactions with Golf Car World and Golf Car Leasing (collectively, Golf). Continental debited Sanwa's account even though one of the co-payees had not endorsed the checks. When Sanwa demanded over a year later that Continental recredit its account, Continental refused. Sanwa then filed suit alleging that Continental had charged its account for items that were not "properly payable," in violation of section 4—401(1) of the Uniform Commercial Code (Ill. Rev. Stat. 1985, ch. 26, par. 4—401(1)). The circuit court granted Sanwa's motion for partial summary judgment on liability, but it also granted Continental's subsequent motions for summary judgment on damages. We affirm.

Club Car (Club) manufactures golf cars; Golf Car World is a Club distributor. In 1986, Sanwa and Golf apparently contemplated that Golf, with financing from Sanwa, would purchase 317 golf cars from Club and sell them to Sanwa, which then would lease them back to Golf under equipment lease agreements (the Agreements). Golf in turn would sublet them to golf courses. To this end, Golf and Sanwa entered four separate transactions for the 317 cars. In transactions No. 1 and No. 3, Golf purchased 165 and 60 cars, respectively, and it leased them from Sanwa for sublet to golf courses for the season. In transaction No. 2, Golf purchased 32 cars, which it leased from Sanwa to be used intermittently as a "tournament fleet." In transaction No. 4, Golf purchased 60 cars that Sanwa leased directly to a country club. Nothing in the record, however, indicates that Golf sold the cars to Sanwa after purchasing them from Club.

To fund Golf's purchase of the cars, Sanwa wrote five checks, totaling over $800,000, on its account with Continental; each check was made to the order of Golf[1] and Club as co-payees. Only Golf endorsed the checks, which it deposited at another bank. Golf purchased over 317 cars with checks to Club in amounts different from the Sanwa checks. Golf performed the Agreements for a while, but its owner later filed for bankruptcy. Sanwa recovered only $200,000 because it found only 100 of the cars, which had been scattered all over the country. Sanwa then noticed the missing endorsements, but Continental would not recredit its account for the face value of the checks.

The record contains no bills of sale or title documents,[2] but it does include various other documents, such as the three Agreements between Golf and Sanwa; the agreement between Sanwa and the country club; invoices from Club to Golf and from Golf to Sanwa; the five checks; delivery and acceptance certificates from Golf and the golf courses; lease assignments from Golf to Sanwa for all the subleases; guarantees from Golf's owner and another person for the three Sanwa/Golf Agreements; and Sanwa's Uniform Commercial Code (UCC) filings to protect its security interest in the cars.

---

[1] Two were to Golf Car World alone, two to Golf Car World and Golf Car Leasing.

[2] Although Sanwa claims it was "very concerned" about title to the cars, it apparently never demanded it. Instead, all the checks were designated as loan proceeds, so its interest in the cars became a purchase money security interest. See Ill. Rev. Stat. 1991, ch. 26, par. 9—107 (a "purchase money security interest" is a security interest that is "taken by a person who by making advances *** gives value to enable the debtor to acquire rights in or the use of collateral if such value is in fact so used").

In its second amended complaint, Sanwa alleged that Continental had improperly paid the checks over the missing endorsement. It also alleged that (1) Continental knew the nature of Sanwa's transactions with Golf and that Sanwa had made the checks out to joint payees to verify the existence of the cars and their conveyance from Club to Golf; (2) Sanwa was relying on Continental to get the endorsement of Club for these reasons; and (3) Club had not received the proceeds of the checks. Were it not for Continental's breach of its statutory duty to Sanwa, Sanwa alleged, it would have been put on notice of the irregularities of Gulf's purchases and could have avoided its losses.

Continental responded that Sanwa suffered no damages because Club, the intended co-payee, had been paid for the 317 cars, the purpose of the checks. It also raised other affirmative defenses, including ratification and lack of causation. In reply, Sanwa denied that Club received the proceeds of the checks for the purposes intended.

Sanwa moved for partial summary judgment on the issue of liability on all five checks. It argued that Continental had paid the checks despite the missing endorsements and that by charging Sanwa's account for these checks, Continental violated section 4—401(1) of the UCC (Ill. Rev. Stat. 1985, ch. 26, par. 4—401). The court granted Sanwa's motion.

Next, Continental moved for summary judgment on the issue of damages from the four checks for the first three transactions. It argued among other things that the undisputed facts showed that Club had received the proceeds of the checks for the purchase of the 257 cars in those transactions and that Sanwa's loss, if any, was not caused by Continental's improper payment. Sanwa countered that summary judgment would be improper in light of the remaining issues of material fact concerning whether Club received the proceeds of the checks, and even if Club had received the proceeds, whether the proceeds were applied for their intended purposes and what those purposes were. In reply, Continental claimed that it was undisputed that the proceeds of the checks for the first three transactions were used to purchase the cars as Sanwa intended, so Sanwa had suffered no damage. After a hearing, the circuit court granted Continental's motion, stating "[t]here is no genuine issue of material fact as to damages. Based on the exhibits, Sanwa sustained no damage as a direct result of the defendant's breach."

Sanwa moved for reconsideration or clarification, claiming (1) that Continental had not met its burden of proof; (2) material questions of fact existed as to whether Golf had purchased the 257 cars in the first three transactions; and (3) the intended purpose of the checks was at

issue, stressing that questions of intent are particularly inappropriate for summary judgment disposition. At the same time, Continental filed a "supplemental" motion for summary judgment on the issue of damages from the check for the fourth transaction, based on evidence discovered after its earlier motion.

After a hearing, the court granted Continental's supplemental motion for summary judgment and denied Sanwa's motion for reconsideration.

## I

The standard of review for the grant or denial of a motion for summary judgment under section 2—1005 of the Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 2—1005) is a familiar one:

> "Although the use of a summary judgment procedure is encouraged as an aid in expeditious disposition of a lawsuit, it is a drastic means of disposing of litigation and should only be allowed when the right of the moving party is clear and free from doubt. [Citation.] 'In determining whether the moving party is entitled to summary judgment, the court must construe the pleadings, depositions, admissions and affidavits strictly against the movant and liberally in favor of the opponent.' [Citations.] In short, '[a] motion for summary judgment is to be decided on the basis of the record as it exists at the time the motion is heard.' [Citation.]

> Furthermore, it is well established that in deciding a motion for summary judgment, the court may draw inferences from the undisputed facts. However, where reasonable persons could draw divergent inferences from the undisputed facts, the issue should be decided by the trier of fact and the motion should be denied. [Citation.] In light of the standard, the trial court does not have any discretion in deciding the matter." (*Loyola Academy v. S & S Roof Maintenance, Inc.* (1992), 146 Ill. 2d 263, 271-72, 586 N.E.2d 1211, 1215.)

Accordingly, the *de novo* standard of review is applied (*In re Estate of Hoover* (1992), 226 Ill. App. 3d 422, 427, 589 N.E.2d 899, 903), and "[t]he trial court's summary judgment may be affirmed on any basis appearing in the record whether or not the court relied on that basis or its reasoning was correct." *Ray Dancer, Inc. v. The D M C Corp.* (1992), 230 Ill. App. 3d 40, 50, 594 N.E.2d 1344, 1351.

As for the quantum of evidence necessary to prevail on or defend against a motion for summary judgment,

> "where a party moving for summary judgment files supporting affidavits containing well-pleaded facts and the party opposing the motion files no counteraffidavits, the material facts set forth in the movant's affidavits stand as admitted. If the opponent fails to controvert the proofs offered in support of the motion and the movant's showing of uncontradicted facts would entitle him to judgment as a matter of law, then summary judgment is proper." (*East Side Fire Protection District v. City of Belleville* (1991), 221 Ill. App. 3d 654, 657, 582 N.E.2d 755, 758.)

With these principles in mind, we turn to the merits.

## II

■ A checking account creates a contractual, debtor-creditor relationship between a bank (the drawee or payor bank) and its customer (the drawer); under this contract, a bank has an absolute duty to its customer to pay only the payee(s) named on a check. (*National Bank v. Quinn* (1988), 126 Ill. 2d 129, 134-35, 533 N.E.2d 846, 849, quoting *United States Cold Storage Co. v. Central Manufacturing District Bank* (1931), 343 Ill. 503, 513, 175 N.E. 825, and *Cosmopolitan State Bank v. Lake Shore Trust & Savings Bank* (1931), 343 Ill. 347, 351-52, 175 N.E. 583.) In *National Bank*, for example, the drawer named a partnership as the payee; the partnership's general partner, who was an authorized signatory on the partnership account, endorsed the check but deposited it into his personal account instead. Ten months later, the drawer demanded that the bank recredit his account, claiming that the check had not been "properly payable" under section 4—401 of the UCC (Ill. Rev. Stat. 1985, ch. 26, par. 4—401). Our supreme court ruled in the drawer's favor, holding that

> "when a check is made payable to order ***, the drawer has the right to expect that the named payee has indorsed the check and thereby directs further negotiation or, in the alternative, that the funds have been deposited only in the account of the named payee. Failing this, the drawer may succeed in a section 4—401(1) claim." *National Bank*, 126 Ill. 2d at 139, 533 N.E.2d at 851.

■ The checks at issue here named both Club and Golf as payees but Golf alone had endorsed them. At the time the checks at issue were written, section 3—116(b) of the UCC stated that "[a]n instrument payable to the order of two or more persons *** if not in the alternative is payable to all of them and may be negotiated, discharged or enforced only by all of them." (Ill. Rev. Stat. 1985, ch. 26,

par. 3—116(b).) Thus, without Club's endorsement, the checks were not "properly payable" under section 4—401, as the circuit court correctly held and Continental does not contest. The next question before the circuit court was damages.

Although Sanwa acknowledged at oral argument on the motion that the face value would be reduced by the amount it received by selling the cars it recovered, it urges this court to adopt the Ohio rule, as articulated in *Cincinnati Insurance Co. v. First National Bank* (1980), 63 Ohio St. 2d 220, 225, 407 N.E.2d 519, 521-22, that a drawer need not prove actual damages before a drawee bank must recredit the face value of improperly paid checks. There, the court then declined to apply the general damages provision of the UCC, which states that when calculating damages, the court must reduce the face value of the checks "by an amount which could not have been realized by the use of ordinary care" (Ill. Rev. Stat. 1985, ch. 26, par. 4—103(5)). It commented that the improper payment was not a "negligence-type action," so this provision did not apply because it is predicated on an act of negligence rather than a breach of statutory duty, such as payment of a check over a missing endorsement.

■ Like the Colorado Supreme Court, sitting *en banc* in *Isaac v. American Heritage Bank & Trust Co.* (Colo. 1984), 675 P.2d 742, we reject the reasoning of *Cincinnati Insurance.* Instead, we apply the general damages provision in the UCC, for in Illinois, Continental's conduct is considered to be a failure to exercise reasonable care (see, *e.g., Spec-Cast, Inc. v. First National Bank & Trust Co.* (1989), 128 Ill. 2d 167, 173, 538 N.E.2d 543, 545 (bank, by paying check that drawer did not sign, "failed to exercise reasonable care")). Unlike the Ohio court, we find that use of this measure of damages is consistent with the intent of the UCC mandate for liberal construction so that "the aggrieved party may be put in as good a position as if the other party had fully performed" (Ill. Rev. Stat. 1985, ch. 26, par. 1—106). Application of these provisions also is consistent with the general rule of contract law that a party is liable only for the damages caused by its breach of the contract. (*Oakleaf v. Oakleaf & Associates, Inc.* (1988), 173 Ill. App. 3d 637, 646, 527 N.E.2d 926, 932.) When the damages suffered would have occurred even if the breaching party had fully performed, there can be no recovery from the breaching party.

## III

The circuit court granted summary judgment to Continental, deciding that there was no factual question on damages because the par-

ties' submissions demonstrated that Sanwa's damages were not the result of Continental's UCC violation.

Sanwa contends that there remained genuine issues of material fact precluding summary judgment on whether Club received the proceeds of the five checks and, if so, whether it received them for the purposes Sanwa intended. Sanwa asks this court to adopt the rule articulated in *Tonelli v. Chase Manhattan Bank, N.A.* (1977), 41 N.Y.2d 667, 363 N.E.2d 564, 394 N.Y.S.2d 858, in which the court of appeals of New York rejected an unjust enrichment defense by a drawee bank that had issued a cashier's check in exchange for a drawer's unendorsed certified check. Even though the original payee, the drawee, had received the proceeds of the certified check, the court held the drawee liable for the face value of the checks because those proceeds had been converted by thieves for another purpose rather than applied for the purpose intended by the drawer. Sanwa contends that the evidence before the circuit court demonstrated that Club had neither received the proceeds here, which were deposited in Golf's account and cannot be traced to Club, nor received them for the purposes Sanwa intended. To Sanwa, these purposes included (1) Sanwa's intent to finance the purchase of 317 new cars; (2) its desire for verification that these 317 cars were not purchased with another's funds, thereby alerting it to any irregularities in the transactions; and (3) its concern for title to and an interest in the 317 cars. In fact, Sanwa observes, the evidence shows on the contrary that (1) at least 20 cars had been preowned and two were never paid for; (2) four were paid for by others' funds, one of which was purchased months before the Agreements; and (3) Golf paid for 20 of the cars one year after the Sanwa checks, leading to the inference that these 20 were paid for by someone other than Sanwa.

Under *Tonelli*, a bank may avoid liability for the face value of unendorsed checks if it demonstrates that the proceeds of a check reached the intended payee for the intended purpose. In doing so, the drawee shows that the drawer suffered no loss. Although Sanwa contends that the question this case presents is whether Illinois will adopt the *Tonelli* test, that is only one way to defend an action such as this one. A drawer must show that the bank's conduct was a cause of its loss, so even if a drawer has suffered a loss, he cannot recover the face value of the checks if the drawee can establish that the cause of that loss was something other than the drawer's improper payment. (*Isaac v. American Heritage Bank & Trust Co.* (Colo. 1984), 675 P.2d 742.) In either event, the drawer is in the same position he would have been in had the drawee fully performed, as mandated by

the UCC. Therefore, Continental would have been entitled to judgment as a matter of law if it demonstrated either that Sanwa suffered no losses (*Tonelli*, 41 N.Y. 2d 667, 363 N.E.2d 564, 394 N.Y.S. 2d 858) or that any losses it did suffer would have occurred even if Continental had exercised ordinary care (*Isaac*, 675 P.2d 742). Here, the circuit court's order states not that Sanwa suffered no injury, but that "[b]ased on the exhibits, Sanwa sustained no damage *as a direct result of the defendant's breach*" (emphasis added). Therefore, we do not look to *Tonelli* for guidance. Instead, the question is whether the circuit court correctly analyzed the record when deciding that given the record before it, there was no question of fact that Continental had not caused Sanwa's losses.

■ Although a drawer has the initial burden of demonstrating the causal link between its injury and the drawee's breach, Sanwa easily met this burden because Continental's payment of the unendorsed checks was *prima facie* evidence of its loss; the burden of proof then shifted to Continental. (*Isaac*, 675 P.2d at 746.) On summary judgment, as explained in *East Side Fire Protection District*, 221 Ill. App. 3d at 657, 582 N.E.2d at 758, if Continental's evidence demonstrated that there existed no factual question on this issue, Continental would be entitled to judgment as a matter of law unless Sanwa presented evidence to controvert Continental's proofs, thereby raising a question of fact for a jury.

Sanwa asserts that its injury occurred "only because [Continental] failed to fulfill the duty it owed to Sanwa" and that if Continental had demanded Club's endorsement, it would not have suffered its losses. It speculates that if Continental had told Sanwa of Golf's attempt to cash the first two checks without Club's endorsement, Sanwa would have been put on notice sufficient to discover Golf's scheme. It also argues that if the checks had been presented to Club, there exist fact questions such as whether Club would have made inquiry of Sanwa, leading Sanwa to stop payment on the first two checks and not write the other three, and whether "Sanwa may not have entered the transactions which resulted in losses of $600,000 to Sanwa when Golf filed for bankruptcy." Sanwa further claims that even if Sanwa's losses were the result of Golf's fraud and would have occurred without Continental's UCC violation, this court should follow *Kosic v. Marine Midland Bank* (1980), 76 A.D. 89, 430 N.Y.S.2d 175, *aff'd* (1981), 55 N.Y.2d 621, 430 N.E.2d 1317, 446 N.Y.S.2d 264, and reject this defense. Even if the defense were available, it continues, Continental failed to meet its burden of proof on this point.

We disagree with Sanwa's interpretation of *Kosic*. *Kosic*, like *Tonelli*, concerned unjust enrichment, not causation. There, the court found that "[t]he critical element upon which the defense [of unjust enrichment] depends, i.e., that the funds actually benefitted the intended payee, is wanting." (76 A.D. at 93, 430 N.Y.S.2d at 178.) Here, Continental's defense is not only that Sanwa would be unjustly enriched by recrediting its account but also that Golf's insolvency and Sanwa's inability to locate its collateral caused Sanwa's losses. On this point, Continental's evidence demonstrated conclusively that Golf's double financing, its inability to perform the Agreements, its relocation of the cars, and its owner's bankruptcy caused Sanwa's losses, as did Sanwa's own lax business practices.

For example, Sanwa was content with certificates of delivery that lacked dates or serial numbers or both and with invoices from Golf that contained no serial numbers. In addition, despite its alleged concern for title to the cars, many of Sanwa's UCC security interest filings were untimely filed or filed in the wrong county or both. In addition, although Sanwa insists that had Club been given the opportunity to endorse the checks, it would have applied them only to the purchases Sanwa intended or that it would have alerted Sanwa, Sanwa offered no proof that these events would have occurred. Similarly, although Sanwa insists that had Continental noticed the missing endorsement, it would have returned the checks to Sanwa, thereby alerting it to the irregularity, Sanwa presented no proof of the likelihood of this scenario. In relying on its complaint and its *prima facie* case rather than presenting evidence to controvert Continental's proofs, Sanwa failed to keep alive any question of material fact concerning the cause of its losses. Accordingly, the circuit court correctly determined that there was no outstanding question of material fact.

## IV

We would affirm the circuit court on the basis of ratification as well. In a similar case, *Spec-Cast, Inc. v. First National Bank & Trust Co.* (1989), 128 Ill. 2d 167, 538 N.E.2d 543, the drawer forgot to sign a check, but the drawee honored it anyway. In the underlying transaction, the drawer had loaned the payee $20,000, in return for which he accepted the payee's unsecured promissory note instead of collateral. After making only one payment on the note, the payee went bankrupt. The drawer filed suit against the bank to recredit his account, claiming he could not be held liable for the unsigned check under section 3—401 of the UCC (Ill. Rev. Stat. 1985, ch. 26, par. 3—401). Our supreme court ruled in favor of the bank because the

drawer had received a benefit for the bank's payment of the check (the promissory note) and had accepted a payment on the note, commenting:

> "[The plaintiff] may have wanted collateral in automobiles; nevertheless, his receipt and acceptance of a payment on the note constituted a ratification of the bank's payment of the check. [Citations.] It was unforeseeable at the time of this deal that [the payee] would file for bankruptcy the next year. Though the bargain [the plaintiff] received was ultimately not profitable, he did receive a promissory note in exchange for the $20,000 paid to [the payee], thus obtaining the benefit of the bank's payment of the check." *Spec-Cast*, 128 Ill. 2d at 178-79, 538 N.E.2d at 547.

Like the drawer in *Spec-Cast*, Sanwa wanted to fund the purchase of only the 317 cars that were the subject of the Agreements, but it accepted Golf's performance of the Agreements for more than a year. It was not foreseeable in 1986 that Golf's owner would file bankruptcy less than two years later, as Sanwa's own credit reviews attest. It was also not foreseeable that Golf would make it impossible to recover the collateral by moving the cars around the country. The transactions were unprofitable for Sanwa, to be sure, but Sanwa did receive the benefit of Continental's payment of the checks. Thus, Sanwa's conduct constituted ratification of Continental's improper payments of the checks.

For the reasons stated above, we affirm the judgment of the circuit court.

Affirmed.

McCORMICK, P.J., and SCARIANO, J., concur.