NOT DESIGNATED FOR PUBLICATION

No. 127,035

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

GLENN D. HERMAN,
*Appellant*,

v.

CROSSROADS CREDIT UNION,
*Appellee*.

MEMORANDUM OPINION

Appeal from Marion District Court; COURTNEY D. BOEHM, judge. Submitted without oral argument. Opinion filed September 12, 2025. Affirmed.

*R. Patrick Riordan*, of Riordan, Fincher, & Mayo, PA, of Topeka, for appellant.

*John G. Schultz*, of Franke, Schultz & Mullen, P.C., of Kansas City, Missouri, for appellee.

Before PICKERING, P.J., ISHERWOOD and HURST, JJ.

PICKERING, J.: In this case, we review a district court's granting of the defendant's motion for summary judgment. Here, Glenn D. Herman sued Crossroads Credit Union, claiming five payments made by Crossroads in October and November 2019 were not issued in accordance with Herman's instructions and were not properly payable under K.S.A. 84-4-401. Crossroads asserted the intended payee defense, arguing that the payments reached the intended payees for their intended purpose. The district court granted summary judgment to Crossroads, concluding Herman could not show Crossroads caused any damages. Herman appeals, claiming factual disputes exist over the

1

application of the intended payee defense. After reviewing the record, we find the district court did not err in granting summary judgment. Accordingly, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

In 2022, Herman filed a petition claiming a violation of the Uniform Commercial Code (UCC), K.S.A. 84-4-101 et seq., and conversion. Both Herman and Crossroads moved for summary judgment. In its summary judgment ruling, the district court made the following findings of uncontroverted facts:

On August 21, 2019, Herman obtained a loan from Crossroads, totaling $132,458.95, for upgrades to a commercial building in Goessel, Kansas. Part of the loan proceeds—$75,000—was deposited into Herman's Crossroads account to be used for the building project; the remaining money went toward paying off a prior loan.

Herman and Duston Logan, the owner of Cornerstone Builders, were supposed to execute a contract for the building work. In October 2019, the contract had not been executed, and Herman would not pay Cornerstone until a contract was signed. Cornerstone agreed to execute a contract but requested $12,000 for plumbing and electrical costs for the building project. On October 23, 2019, Herman directed Crossroads to issue a cashier's check for $12,000 to Cornerstone. That same day, Logan went to Crossroads to cash out the cashier's check, but Crossroads had a $3,000 cash out limit. At Cornerstone's request, Crossroads voided the cashier's check. Instead of the single $12,000 cashier's check, Crossroads withdrew the funds from Herman's account and issued the following payments totaling $12,000:

- cashier's check to Funk Electric, a subcontractor for Cornerstone, for $7,379.11;
- cashier's check to Cornerstone for $2,620.89;
- cash totaling $2,000 to Cornerstone.

Crossroads did not inform Herman of the voided check or these payments at the time, nor did it disclose Cornerstone's actions to Herman.

In November 2019, Cornerstone told Herman it was ready to begin additional work on the building. Thereafter, Herman directed Crossroads to issue a cashier's check for $18,000 to Cornerstone for the next phase of building work. On November 18, 2019, Logan went to Crossroads to collect the check. Instead of the single $18,000 cashier's check, Crossroads issued two cashier's checks to Cornerstone, one for $15,000 and the other for $3,000. Neither Crossroads nor Cornerstone informed Herman of these payments at the time nor of Cornerstone's actions.

After receiving the $7,379.11 cashier's check from Crossroads, Funk Electric told Herman it was still owed $2,853.86 for building work Cornerstone had ordered. Funk Electric claimed "that it was a contractor to Herman and that Herman is directly liable to Funk Electric." To satisfy this claim, Herman paid the $2,853.86 to Funk Electric. Herman asked Cornerstone to execute a contract conferring liability to subcontractors on Cornerstone, though the parties never executed such a contract. In addition to the Funk Electric bill, Herman also paid a bill for $1,225.64 to the City of Goessel for services to the building.

In December 2019, Herman became "increasingly dissatisfied" with Cornerstone because it had not done any building work since Herman agreed to pay the additional $18,000. In January 2020, Herman received a statement from Crossroads reflecting the October 2019 and November 2019 payments. Thereafter, Herman filed complaints about

3

Crossroads' payments with the Kansas Attorney General's Office, the National Credit Union Administration, the Governor's office, the Federal Trade Commission, and the Kansas Department of Credit Unions.

Based on these facts, the district court granted Crossroads' summary judgment motion and denied Herman's summary judgment motion. The court explained its reasoning: "The Court finds that Plaintiff's claims fail as a matter of law because there is no evidence that Plaintiff suffered any damages. Plaintiff's claims require a foundational element: evidence of actual damages. Plaintiff cannot plausibly put forth evidence that he was damaged in any way." The court found that because Crossroads issued the payments in "the same amount requested and authorized" by Herman, Herman could not "put forth any evidence that he incurred actual damages or that the Defendant's technicality of not conveying the funds in a singular check was the proximate cause of any alleged damages."

Herman now appeals.

ANALYSIS

*The District Court Did Not Err in Granting Summary Judgment to Crossroads*

*The rules we follow for summary judgment*

When determining whether a material factual dispute exists on a summary judgment ruling, appellate courts determine whether "reasonable minds could differ as to the conclusions drawn from the evidence . . . . Appellate review of the legal effect of undisputed facts is de novo." *GFTLenexa, LLC v. City of Lenexa*, 310 Kan. 976, 982, 453 P.3d 304 (2019).

4

"When the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law, summary judgment is appropriate." *Sanchez v. U.S.D. 469*, 50 Kan. App. 2d 1185, 1191, 339 P.3d 399 (2014). When ruling on a party's motion for summary judgment, "[t]he district court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought." 50 Kan. App. 2d at 1191-92. "When opposing summary judgment, a party must produce evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issue in the case." *GFTLenexa*, 310 Kan. at 982.

*Kansas recognizes the intended payee defense.*

Our Supreme Court recognized the intended payee defense in *Hall v. Mid-Century Ins. Co.*, 248 Kan. 847, 851, 811 P.2d 855 (1991). There, Hall and his cocounsel had agreed to split the attorney fees after settling their client's personal injury lawsuit. The two also agreed that Hall's fees would be deposited in cocounsel's general account. After the settlement, the client endorsed the insurance company's bank draft for deposit in cocounsel's trust account. Cocounsel negotiated the draft to the bank, after which the bank deposited the draft in cocounsel's trust account. The bank then allowed cocounsel to write a check for the total amount of attorney fees for deposit into cocounsel's general account. Hall sued the insurance company and the bank involved for conversion for paying the bank draft without his endorsement.

The Supreme Court applied the intended payee defense, finding that "[t]he funds were deposited in the intended account. The absence of endorsement is simply technical and caused Hall no loss." 248 Kan. at 851. The court further explained its reasoning:  "If

5

the funds actually reached the intended payee, does it matter along the way if there is a missing or unauthorized endorsement?" 248 Kan. at 851.

The intended payee defense applies when "[c]ommon notions of equity suggest that liability may not be predicated on strict liability theories if the funds reach the intended payee." 248 Kan. at 851. As the *Hall* court acknowledged, the theory of this defense is grounded on a fundamental principle of equity. See *Ambassador Financial Services, Inc. v. Indiana Nat. Bank*, 605 N.E.2d 746, 754 (Ind. 1992) (explaining intended payee defense applies when [1] the intended payee received the check proceeds at issue and [2] the check writer suffered no damages "proximately caused by the bank's improper payment").

*How damages relate to the intended payee defense*

Generally, when a bank issues an improper payment, the account holder can "recover compensatory damages equal to the loss sustained by the depositor, typically the amount improperly debited to the drawer's account, less any amount which could not have been realized by the exercise of ordinary care, or any amount to which the payee was actually entitled from the customer." 11 Am. Jur. 2d, Banks and Financial Institutions § 881; see K.S.A. 84-4-402(b).

Consequently, notwithstanding the improper payment, the intended payee defense acts as "an exception to a bank's liability" if the bank can show that the payment reached the intended payee and the account holder suffered no damages caused by the payment. 11 Am. Jur. 2d, Banks and Financial Institutions § 898. As the Indiana Supreme Court explained: "An improper payment proximately causes damages from a transaction when the improper payment alters the course of the transaction in a way necessary for the occurrence of damages." *Ambassador*, 605 N.E.2d at 754.

Thus, to succeed on an improper payment claim and avoid the intended payee defense, the account holder must show damages caused by the improper payment. See *Isaac v. American Heritage Bank and Trust Co.*, 675 P.2d 742, 745-46 (Colo. 1984) (holding bank customer must show damages to be entitled to recredit for improper payment; "ultimate burden of proof of loss" remains with customer if bank makes intended payee defense showing); *Sanwa Business Credit Corp. v. Continental Illinois Nat. Bank and Trust Co. of Chicago*, 247 Ill. App. 3d 155, 162, 617 N.E.2d 253 (1993) ("A drawer must show that the bank's conduct was a cause of its loss, so even if a drawer has suffered a loss, he cannot recover the face value of the checks if the drawee can establish that the cause of that loss was something other than the drawer's improper payment."); *Gotham-Vladimir Advertising, Inc. v. First Nat. City Bank*, 277 N.Y.S.2d 719, 723, 27 A.D.2d 190 (1967) (finding plaintiff failed to prove damages caused by bank's payment).

With this understanding of the intended payee defense and how it relates to damages, we now move to the district court's granting of Crossroads' summary judgment motion.

*Whether a genuine factual dispute exists*

Herman contends the district court erred in granting summary judgment to Crossroads because genuine factual disputes existed over the application of the intended payee defense. He claims these factual disputes included the background and financing for the building project and whether he would have authorized additional work by Cornerstone if he had known about the October 2019 payments. Herman asserts the district court acknowledged Crossroads' failure to follow his instructions but still considered the payments authorized. Therefore, he argues, the court erroneously treated the intended payee defense as an authorization of Crossroads' payments. Herman further

7

claims that by issuing a cashier's check to Funk Electric, Crossroads made him potentially liable for subcontractor expenses in the future.

Crossroads asserts that Herman ignores the district court's ruling that his claim failed for lack of damages, independent of the intended payee defense. Crossroads further responds that because the full $30,000 requested by Herman reached Cornerstone and Herman suffered no damages, the intended payee defense applies. Crossroads also argues there are no factual disputes relevant to the intended payee defense because it is undisputed that Herman directed Crossroads to convey the funds to pay for building work.

Herman replies that he has not waived any argument on damages but that the dispute is whether Crossroads' actions were "a mere technical violation of [K.S.A.] 84-4-401 or something greater." Under K.S.A. 84-4-401(a), Kansas banks can charge a customer's account if an item is "'properly payable from that account . . . . An item is properly payable if it is authorized by the customer and is in accordance with any agreement between the customer and bank.'" *ALG, Inc. v. Estate of Eldred*, 29 Kan. App. 2d 1011, 1013, 35 P.3d 931 (2001).

*Herman fails to show Crossroads caused any damages.*

In October 2019, Herman directed Crossroads to withdraw $12,000 from his account and issue a cashier's check for the same amount to Cornerstone. Crossroads voided the check at Cornerstone's request and issued a cashier's check for $2,620.89 to Cornerstone, $2,000 in cash to Cornerstone, and a cashier's check for $7,379.11 to Funk Electric, for a total of $12,000.

8

In November 2019, Herman directed Crossroads to withdraw $18,000 from his account and issue a cashier's check in the same amount to Cornerstone. Crossroads instead issued two cashier's checks to Cornerstone for $15,000 and $3,000 respectively.

Herman compares this case to *Tonelli v. Chase Manhattan Bank*, 41 N.Y.2d 667, 363 N.E.2d 564, 394 N.Y.S.2d 858 (1977). In that case, the plaintiff lost funds because of a bank's erroneous issuance of a cashier's check, which allowed a third party to convert check funds. While that case involves a monetary loss for the plaintiff, here Herman has not shown Crossroads caused any loss. We do not find *Tonelli* persuasive.

Crossroads compares this case to *Torkelson v. Bank of Horton*, 208 Kan. 267, 491 P.2d 954 (1971), arguing that the Supreme Court rejected a claim similar to Herman's for lack of damages. *Torkelson* involved a claim that a bank wrongfully dishonored a check, causing a life insurance policy—under which Torkelson was a beneficiary—to lapse shortly before the insured died. But the court found that the injured party from the bank's dishonor of the check was the insured, not Torkelson, who was neither the payee nor the writer of the check at issue and did not suffer damages. 208 Kan. at 271-72.

*Torkelson* is also not comparable to this case. Herman has not shown that Crossroads contributed to Cornerstone's or Funk Electric's misappropriation of funds in this case, even though Crossroads did not pay the funds according to Herman's instructions. Crossroads issued the October payments for work performed on Herman's building. That money would have gone to Cornerstone and Funk Electric whether or not Crossroads issued payments according to Herman's specific instructions. Herman did not allege those payments were misappropriated for some purpose other than building work.

Furthermore, the November payments both went to Cornerstone in the same total amount as Herman requested. While it appears Cornerstone did not complete the additional building work as intended by the November payments, Herman fails to show how Crossroads enabled Cornerstone's failure to perform the additional work by issuing two checks rather than one.

We find the November 2019 payments in this case—where Crossroads issued to Cornerstone two cashier's checks totaling the requested $18,000—track closely with the facts in *Hall*. Where the funds in *Hall* reached the intended bank account without Hall's endorsement, the check proceeds in this case reached Cornerstone—the intended payee—albeit through two separate checks instead of a single check.

The October 2019 payments—where Crossroads issued two payments to Cornerstone and one payment to Funk Electric for the total requested by Herman—present a more nuanced question. These payments appear to have gone toward their original purpose of paying for building work. That said, while two of the October payments went to Cornerstone as the intended payee, Herman never directed Crossroads to issue payments to Funk Electric.

The parties disagree on whether the payments in this case were technicalities as in *Hall* or whether they were something more serious. But, as Crossroads suggests, the November 2019 payments appear to be a technicality as contemplated for the intended payee defense in *Hall*.

As this case demonstrates, the question of damages and the intended payee defense can overlap with each other. The November 2019 payments in this case all went to the named payee—Cornerstone. Only part of the October 2019 payments went to Cornerstone, though Cornerstone authorized payment to Funk Electric and the payment went toward the intended purpose of paying for the building work. The record shows that

10

Herman was not opposed to proceeds from his payments to Cornerstone going to subcontractors. After Crossroads issued the October 2019 payments, Herman became aware that approximately $8,000 had gone to electricians. Four days later, Herman directed Crossroads to issue the $18,000 cashier's check to Cornerstone for additional building work.

Important in our consideration of damages, Herman has not shown that Crossroads caused any losses. Crossroads issued the same amount authorized by Herman to pay for building work already done. There is no evidence that the October 2019 funds went toward some purpose other than their intended purpose. The portion of the $12,000 authorized by Herman that Crossroads paid to Funk Electric likely would have gone to Funk Electric even if Crossroads paid the full $12,000 directly to Cornerstone.

Likewise, Crossroads issued the November 2019 payments to the same payee and in the same amount authorized by Herman to pay for future work. The single $18,000 check in November 2019 would have reached Cornerstone the same as the two checks Crossroads actually paid. While it appears Cornerstone did not follow through on the additional work, Crossroads does not control whether Cornerstone performs work it has promised to do. Herman claims a factual dispute exists over whether he would have authorized the additional building work if he had known how Crossroads issued the October 2019 payments. The likelihood of that claim is unclear given that Herman knew at the time part of his money had gone to subcontractors. In any case, that claim sidesteps the fact Crossroads did not cause Herman's dissatisfaction with Cornerstone's performance on the building work.

Herman also claims that by issuing payment directly to Funk Electric, Crossroads exposed him to potential liability to pay Funk Electric for its subcontract work. Yet Herman does not explain how Crossroads' payment resulted in his potential liability. As our Supreme Court has acknowledged:  "There is no privity of contract between a

11

subcontractor and a property owner, and the former can obtain a lien only by complying with the statutory provisions." *Sutherland Lumber Co. v. Due*, 212 Kan. 658, 660, 512 P.2d 525 (1973). Herman fails to show how Crossroads' actions, rather than Herman's apparent failure to direct Funk Electric to Cornerstone for payment, caused him to pay an additional bill from Funk Electric.

Because Herman fails to show that Crossroads caused any loss to him, the district court did not err in granting summary judgment for Crossroads.

Affirmed.

* * *

HURST, J., concurring in part and dissenting in part: While I concur with the majority that the intended payee exception could be used to save Crossroads from liability for the November 2019 payments at issue and some of the October 2019 payments, it does not apply to the $7,379.11 check payable to Funk Electric.

The district court ultimately granted Crossroads summary judgment after finding that Herman suffered no damages from its claims. Crossroads' contention that Herman could not demonstrate damages relying on the damage provision in K.S.A. 84-4-402(b), which limits "damages proximately caused by the *wrongful dishonor* of an item" to the "actual damages proved" where those damages "may include . . . consequential damages" is misplaced. (Emphasis added.) K.S.A. 84-4-402(b) applies when a bank "wrongfully dishonors" a check that is "properly payable" from a customer's account. K.S.A. 84-4-402(a). But as Herman correctly argued, it does not assert claims for wrongful dishonor; rather, its claims allege liability for Crossroads' wrongful payment from its account in violation of K.S.A. 84-4-401(a). Banks may only "charge against the account of a customer an item that is properly payable" and "[a]n item is properly payable if it is

12

authorized by the customer and is in accordance with any agreement between the customer and bank." K.S.A. 84-4-401(a).

The district court's characterization of Crossroads' failure to follow Herman's directions as a "technical" violation, its reference to "actual damages," and its failure to address consequential damages supports the majority's conclusion that the district court applied the intended payee exception. It appears the district court determined that because the amounts withdrawn from Herman's account in the October and November 2019 transactions matched the total amount Herman requested be withdrawn—there could be no damages. Therefore, I will only address the district court's damages findings related to the intended payee exception as the district court did not support its finding with any other legal theory.

While I understand the impetus under these facts to apply the adage "no harm no foul," such a conclusion ignores the gravity of a bank's refusal to adhere to UCC mandates. The Kansas UCC must be liberally construed to promote its purpose and policies:

> "(1) To simplify, clarify, and modernize the law governing commercial transactions;
> "(2) to permit the continued expansion of commercial practices through custom, usage and agreement of the parties; and
> "(3) to make uniform the law among the various jurisdictions." K.S.A. 2024 Supp. 84-1-103(a).

The UCC is intended to ensure people can engage in interstate commercial transactions, including banking, in reliance on common and uniform standards for those transactions.

The uniform law related to negotiable instruments and banking is paramount to interstate commercial transactions, ensuring uniform or minimal standards for operations

13

to promote economic stability. As such, courts have applied principles of strict liability related to a bank's UCC compliance. See, e.g., *Monreal v. Fleet Bank*, 95 N.Y.2d 204, 207, 735 N.E.2d 880, 713 N.Y.S.2d 301 (2000) (The UCC "fastens strict liability on a bank that charges against its customer's account any 'item' that is not 'properly payable.'"). Similarly, the Kansas Supreme Court has applied strict liability principles to a bank's duties to its customers and explained that a bank is "virtually the insurer of the validity of the depositor's signature." *Herbel v. Peoples State Bank of Ellinwood*, 170 Kan. 620, 631, 228 P.2d 929 (1951). However, that strict liability can be modified to a requirement to "exercise reasonable care in the detection of forgeries" when the customer breaches their duty to the bank, similar to the exceptions to the strict liability imposed by the UCC. *Herbel*, 170 Kan. 620, Syl. ¶ 10; see also *Hall v. Mid-Century Ins. Co.*, 248 Kan. 847, 851, 811 P.2d 855 (1991) (applying intended payee exception to strict liability); *Monreal,* 95 N.Y.2d at 207 (explaining UCC also imposes "reciprocal duties on the customer, which limits the bank's strict liability exposure").

Absent an applicable exception, Kansas courts generally impose strict liability on a bank's violations of the UCC or its duties to ensure the validity of its customer's signature. See *Hall*, 248 Kan. at 851; *Herbel*, 170 Kan. at 631. As the majority explains, the Kansas Supreme Court has applied the intended payee exception to a bank's strict liability when "the funds reach the intended payee." *Hall*, 248 Kan. at 851. Strict liability merely means that a party can be held liable without showing that the party acted negligently or with nefarious intent. See*, e.g., Eastman v. Coffeyville Resources Refining & Marketing*, 295 Kan. 470, 474, 477, 284 P.3d 1049 (2012). While I agree in the existence of the intended payee exception, I deviate from the majority's application of the exception as I do not believe it shields Crossroads from liability in each of the transactions at issue.

The intended payee exception to liability applies when the drawer's intended payee received the proceeds at issue and when the drawer "suffered no loss or adverse effect on

14

its rights in the transaction that was proximately caused by the bank's improper payment." *Ambassador Financial Services., Inc. v. Indiana Nat. Bank*, 605 N.E.2d 746, 754 (Ind. 1992). The Kansas Supreme Court—like other courts applying this exception—has applied this exception when the bank negotiates an instrument to the correct payee over a missing, irregular, or erroneous endorsement. See *Hall*, 248 Kan. 847, Syl. ¶ 1 ("Where an instrument is paid over a missing endorsement and there is no damage or loss to the nonendorsing payee, the nonendorsing payee may not recover damages under either K.S.A. 84-3-116[b] or K.S.A. 84-3-419[c] of the Uniform Commercial Code."); *Sanwa Business Credit Corp. v. Continental Illinois Nat. Bank and Trust Co. of Chicago*, 247 Ill. App. 3d 155, 162, 617 N.E.2d 253 (1993) (plaintiff sought damages from bank's payment of check payable to two co-payees with endorsement of only one payee); *Gotham-Vladimir Adv. v. First Natl. City Bank*, 27 A.D.2d 190, 193-94, 277 N.Y.S.2d 719 (1967) (action brought against payor banks for checks payable to business A deposited in business B account where it was demonstrated that Business A used the Business B account). In applying the intended payee exception, the Kansas Supreme Court explained: "If the funds actually reached the intended payee, does it matter along the way if there is a missing or unauthorized endorsement?" *Hall*, 248 Kan. at 851. It added that "[c]ommon notions of equity suggest that liability may not be predicated on strict liability theories if the funds reach the intended payee." 248 Kan. at 851.

Although not defined in the Kansas UCC statute, a payee is commonly understood to be the person to whom the drawer made a note or check payable. See *Mid-Continent Specialists, Inc. v. Capital Homes*, 279 Kan. 178, 183, 106 P.3d 483 (2005) (citing Black's Law Dictionary 1129 [6th ed. 1990]). It is undisputed that in the transactions at issue here from October and November 2019, Herman directed Crossroads to issue cashier's checks payable to Cornerstone in specified amounts. Thus, Cornerstone was Herman's intended payee in both instances.

15

In the November 2019 transaction, Herman directed Crossroads to pay Cornerstone $18,000 via a cashier's check. Rather than follow that directive, Crossroads paid Cornerstone $15,000 in one cashier's check and $3,000 in another. Given that Crossroads paid the entire amount directed to Cornerstone—Herman's intended payee—I see no issue applying the intended payee exception to the November 2019 transaction. As for the damages, the district court and majority appear to have found that because Crossroads paid Herman's intended payee the total amount directed—although not in the *manner* directed—Herman cannot demonstrate it suffered damages. That damage analysis is grounded in equity principles as an unjust enrichment defense to technical banking violations and is typically applied to prevent a payee from recovering damages when it received the amount the drawer intended despite the bank's technical UCC violation. See, e.g., *Nisenzon v. Morgan Stanley DW, Inc.,* 546 F. Supp. 2d 213, 230-31 (E.D. Pa. 2008). However, I believe the damage analysis set forth in *Ambassador* is more appropriate here, but under these circumstances, there is no need to dive into that issue further. *Ambassador Financial Services, Inc.,* 605 N.E.2d at 754.

More consequentially, I do not agree that the intended payee exception shields Crossroads from liability in the October 23, 2019 transaction. In that transaction, Herman directed Crossroads to pay a single cashier's check to Cornerstone—Herman's intended payee—for $12,000. It is undisputed that Crossroads ultimately failed to execute that transaction as directed and instead issued a $7,379.11 cashier's check to Funk Electric, a $2,620.89 cashier's check to Cornerstone, and a $2,000 cash withdrawal to Cornerstone directly from Herman's account. Funk Electric is known to Cornerstone as one of its electrical subcontractors—but they are not related entities, subsidiaries, co-owned or operated, or alternative names for each other. That is, they are separate companies in more than just name. Funk Electric was not Herman's intended payee.

While Cornerstone intended to use a part of the $12,000 cashier's check from Herman to pay its subcontractors, that does not turn those subcontractors into Herman's

intended payee. Herman intended to pay Cornerstone for *its* work. Cornerstone completed some of its work through subcontractors that it procured, oversaw, directed, and inspected. Thus Cornerstone's work also includes assurance of the completeness and accuracy of its subcontractors' work. This is a common practice in construction projects where an owner hires a contractor such as Cornerstone who then uses subcontractors to complete work—with the owner removed from direct involvement with the direction and payment of subcontractors. The owner's intent to pay its contractor via withdrawal from the owner's bank account—even if that payment will ultimately be used by the contractor to pay its subcontractors—does not transition the contractor's subcontractor into the owner's intended payee under the intended payee exception to UCC strict liability.

In the October 23, 2019 transaction, Crossroads executed payments from Herman's account in amounts and a manner that differed from Herman's directions. That is highly unusual—and for good reason. If banks, on their own initiative, change the payee of its drawer's checks, the confusion from merely a recordkeeping perspective would be immense. This is not a case where the depositor bank permitted endorsement of a check into a different account than the named payee but where the intended payee also controlled the deposited account. Here, the drawer's bank changed the drawer's intended payee. While Cornerstone may have planned to use some of that $12,000 to pay Funk Electric, Herman's directions to Crossroads left that between Cornerstone and Funk Electric, and Crossroads wrongly changed that to a direct payment from Herman's account.

A bank's responsibility to pay only as directed by its drawer is a fundamental tenet of the UCC. See K.S.A. 84-4-401(a). "If the check is made payable to the order of a person named, the duty of the bank is absolute to pay only to the payee or according to his order." *National Bank of Monticello v. Quinn,* 126 Ill.2d 129, 135, 533 N.E.2d 846 (1988) (citing *United States Cold Storage Co. v. Central Manufacturing District Bank*, 343 Ill. 503, 513, 175 N.E. 825 [1931]). Courts have recognized that the strict liability

17

imposed on banks to pay only as directed by their drawer/customer is subject to recognized exceptions and can be modified by the drawer's/customer's own contractual or statutory violations. See *Herbel*, 170 Kan. 620, Syl. ¶ 10 (discussing exceptions to strict liability for banks); *Hall*, 248 Kan. at 851 (applying intended payee exception to strict liability); *Monreal,* 95 N.Y.2d at 207 (explaining UCC exceptions to strict liability exposure). Here, Crossroads asserted only the intended payee exception to its liability—and that exception does not apply when Crossroads did not pay Herman's intended payee.

Thus, because I believe the intended payee exception to liability is inapplicable to Crossroads' $7,379.11 payment to Funk Electric, and the district court made no other legal conclusion supporting its summary judgment decision, I would reverse and remand on that issue. Moreover, the damage analysis related to the other amounts should consider consequential damages proximately caused by the bank's failure to follow Herman's payment directions. Therefore, I must dissent.